FINAL COPY
294 Ga. 530

S13A1601.  FORD MOTOR COMPANY v. CONLEY et al.

NAHMIAS, Justice.

In December 2007, appellees Jordan and Renee Conley filed a product liability lawsuit against appellant Ford Motor Company in the State Court of Cobb County, based on a single-vehicle rollover accident that occurred in April 2006.[1]  After nearly two years of pretrial discovery and motions practice, the case went to trial on November 9, 2009.  The jury, which was not qualified as to relationships with any of Ford's insurers, returned a verdict in favor of Ford on November 19.  The trial court entered judgment on the verdict on November 30, 2009, and the Conleys did not file an appeal.

Based on information about Ford's insurers that came to light more than a year later, however, the Conleys filed a motion for new trial on July 15, 2011.  On January 5, 2012, the trial court granted that motion.  Ford filed an application for interlocutory appeal, which the Court of Appeals granted.  The

---

[1] Renee Conley brought the lawsuit as the next friend of Jordan Conley, her minor child who was severely injured in the accident, and as the survivor of her mother, Martha Pendleton, a passenger who died in the accident.

Court of Appeals judges divided evenly on the disposition of the appeal, so the case was transferred to this Court for decision. See Ga. Const. of 1983, Art. VI, Sec. V, Par. V ("In the event of an equal division of the Judges [of the Court of Appeals] when sitting as a body, the case shall be immediately transferred to the Supreme Court."). We heard oral arguments on September 21, 2013, and now, after careful consideration of the record and the contentions of the parties, we affirm the judgment of the trial court. In doing so, we reiterate the high hurdles that must be surmounted before an untimely, "extraordinary" motion for new trial may be granted, but we conclude that the trial court did not abuse its discretion in ruling that the Conleys met that burden under the particular circumstances of this case.

1. Factual and Procedural Background

(a) The Original Conley v. Ford Motor Company Proceeding

On December 7, 2007, in their first set of interrogatories during discovery in the original proceeding, the Conleys requested information about Ford's insurers. There is no dispute that this was an appropriate topic for pretrial discovery. Georgia's civil discovery statute specifically says:

A party may obtain discovery of the existence and contents of

2

any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment. . . .

OCGA § 9-11-26 (b) (2). In addition, under longstanding Georgia law, a plaintiff is entitled to obtain information about insurers who may cover a judgment against the defendant in order to determine whether the trial jury should be qualified as to relationships with such insurers. See OCGA § 15-12-135 (a) (requiring the disqualification of all trial jurors who are "related by consanguinity or affinity to any party interested in the result of the case"); Shipman v. Johnson, 89 Ga. App. 620, 622 (80 SE2d 717) (1954) ("It is well settled that stockholders of an insurance company which carries liability insurance indemnifying a party to an action from a judgment against it in that case are 'interested in the result of the case' and not qualified to serve as jurors . . . .").

The insurance interrogatory that the Conleys posed, and Ford's answer in response, were as follows:

> 5. Please state whether or not Ford carried casualty or liability insurance to insure against the Subject Incident, [sic] if Ford carried casualty and/or liability insurance, please state for each coverage:

3

(a) The full name of the insuring company;
(b) The policy limits;
(c) The effective date of the policy; and
(d) The issuing agent.

ANSWER:

Subject to and without waiving its objections, Ford states it has sufficient resources to cover any judgment which could be reasonably rendered in this case, if any.

Ford objects to this Interrogatory as it is overly broad and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. To the extent this Interrogatory asks for more information, Ford objects as it seeks the discovery of confidential or proprietary information or documents.

In their first set of document requests, also sent on December 7, 2007, the Conleys similarly asked for Ford's insurance information:

10. All insurance agreements or policies under which any person or entity carrying on an insurance business may be liable to satisfy part or all of a judgment which may be rendered in this action or to indemnify or reimburse for payments made to satisfy any judgment.

Ford's response was essentially identical to its answer to Interrogatory No. 5: Ford said that it had sufficient resources to cover any reasonable judgment and then objected in the same way to the document request. Indeed, Ford objected, in the same sort of imprecise and formulaic manner, to almost all of the

4

Conleys' discovery requests: 37 of Ford's 40 interrogatory answers contained objections, as did 68 of Ford's 70 responses to document requests, although as with Interrogatory No. 5 and Document Request No. 10, many of the discovery responses that included objections also included information that, to varying degrees, appeared to satisfy the request.

After receiving Ford's responses, the Conleys sent Ford a letter pursuant to Uniform Superior Court Rule 6.4 (B) on March 11, 2008.[2] The letter identified Interrogatory No. 5, among many others, as requiring further answer:

> We specifically ask that Ford withdraw all general objections that it incorporates into each interrogatory. Ford has basically lodged an objection to each interrogatory.
>
> Plaintiff also specifically requests that Ford withdraw objections to the following interrogatories and answer each within the scope of all vehicles for which information is requested, including Lincoln Aviators:
>
> Interrogatories 1-3, 12, 14-16, 19, 22, 25, 26, 31-34, 37-39.

With respect to the following interrogatories we request that you

---

[2] The case was actually in state court, but Uniform Superior Court Rule 6.4 (B) is identical to Uniform State Court Rule 6.4 (B). The rule says, in relevant part:
> Prior to filing any motion seeking resolution of a discovery dispute, counsel for the moving party shall confer with counsel for the opposing party in a good faith effort to resolve the matters involved. At the time of filing the motion, counsel shall also file a statement certifying that such conference has occurred and that the effort to resolve by agreement the issues raised failed.

5

withdraw the specific objections and answer the questions posed instead of providing self-serving answers that do not respond to the question posed. Additionally, Plaintiff requests that the responses include all vehicles outlined in the specific questions, including Lincoln Aviators.

Interrogatory 5-10, 12-15, 17 (as to all vehicles for which information is sought), 18, 20, 21, 23 (with respect to number 23 – Ford states that it will produce certain documents, please confirm that these documents have been produced), 27-29, 36.

The Conleys' letter similarly asked that Ford "withdraw specific objections, respond to the requests as written, . . . and/or fully respond to the following: Request for Production No. 3, 5-13, 15-20, 22-25, 27-47, 49, 51-53, 55, 56, 58-63, 65."

In response, Ford sent a letter to the Conleys on March 21, 2008, which said:

Ford's answers and objections to Plaintiff's Interrogatories, including interrogatory nos. 1-3, 5-10, 12-23, 25-29, 31-34, and 36-39, are proper and appropriate under the Georgia Rules of Civil Procedure. Accordingly, Ford maintains its answers and objections to these requests. . . . In addition, your letter raises general, broad complaints regarding Ford's answers and objections but fails to address particular interrogatories with the specific grounds for your complaints. Such general, conclusory objections to Ford's answers do not provide Ford with sufficient information to meaningfully respond to each listed interrogatory.

Ford's letter included an essentially identical statement in response to the

6

Conleys' request that Ford withdraw its objections and provide full responses to the document requests.

There was no further communication during discovery regarding Ford's insurance. The Conleys moved to compel Ford to respond to a few requests made later in the discovery process, but they did not file a motion to compel as to Interrogatory No. 5 or Document Request No. 10. Neither the Conleys nor Ford listed on the pretrial order that jurors should be qualified based on Ford's insurers. The Conleys also did not request that jurors be qualified based on Ford's insurers during jury selection; the jury questionnaire did not include any questions about potential jurors' relationships with insurance companies; and the trial court did not ask Ford about its insurers. The jury found in favor of Ford; the court entered judgment on the defense verdict; and the Conleys did not appeal.

(b)  Young v. Ford Motor Company

On June 13, 2011, about 19 months after the judgment in the Conleys' case was entered, the case of Young v. Ford Motor Company began trial in Cobb County State Court before the same judge that had presided over the Conleys' case and with at least two of the same lawyers representing Ford.

7

During discovery, the Youngs sent Ford two requests for insurance information, much as the Conleys had done. Ford responded in much the same way, saying, "Ford has sufficient resources to satisfy any judgment that reasonably could be expected to be awarded as damages in this action, if any"; Ford's responses in Young did not, however, also include an objection. Like the Conleys, the Youngs did not file a motion to compel further answers to its requests for insurance information.

However, the Youngs proposed in their pretrial order that the jury be qualified for relationships with American International Specialty Lines Insurance Company, Lloyds of London, and any other insurer that would provide coverage for Ford. It is unclear from the record where the Youngs got the names of those two specific insurance carriers, but it appears that one of the Youngs' lawyers knew them from a case over which he had presided when he was a state court judge and qualified a jury as to Ford's insurers. In response, Ford submitted its own pretrial order, which stated: "Ford objects to any reference to an alleged insurer of Ford. Ford has sufficient resources to satisfy any judgment that reasonably could be expected to be awarded as damages in this action, if any."

At the end of the first full day of voir dire, the Youngs asked that Ford put on the record that Ford was not insured by any companies that could cover a potential judgment in the case, and the court made it clear that, to avoid a mistrial, the jury would need to be qualified as to Ford's insurers. Ford's counsel said that he had made inquiries over the preceding weekend and, "consistent with our discovery responses here," Ford had "no insurance that would be applicable to satisfy a judgment in this case." The next morning, however, just before the parties began to strike the jury, Ford's counsel reported that Ford did, in fact, have numerous excess coverage insurance policies that might cover a judgment.

The court then declared a mistrial and revoked the pro hac vice admission of Ford's attorneys on the grounds that they had violated Georgia Rules of Professional Conduct Rules 3.3 (candor toward the tribunal) and 3.4 (fairness to opposing party and counsel).[3] The Youngs also moved to sanction Ford by striking its answer to the complaint. After holding an evidentiary hearing on

---

[3] The attorneys appealed, and the Court of Appeals vacated the revocation order and remanded the case, holding that the trial court failed to give the attorneys notice and a meaningful opportunity to be heard before deciding the revocation issue. See Ford Motor Co. v. Young, 322 Ga. App. 348 (745 SE2d 299) (2013).

9

June 20, 2011, the trial court decided that the appropriate sanction was to instruct the jury that it was established that Ford "failed to adequately warn consumers of the danger of a seatbelt during rollovers." The Young case then settled.

(c)    The Conleys' Motion for New Trial

Based on the information about Ford's insurers that came to light during the sanctions hearing in Young, the Conleys filed a motion for new trial on July 15, 2011, arguing that they were entitled to a new trial on the ground that the jury that decided their case had not been properly qualified. After holding an evidentiary hearing, the court granted a new trial on January 5, 2012, concluding that by failing to disclose its insurance coverage, Ford had violated OCGA § 9-11-26 (b) (2) and the court's pretrial scheduling order, which required the parties to comply with the Uniform State Court Rules in completing their proposed pretrial orders.

Relying on testimony given in Young by Ford's in-house counsel, the trial court found that Ford has maintained insurance to cover product liability claims like the Conleys' since 1999 but, "as a general corporate practice, in all

10

jurisdictions, does not disclose any insurance when responding to discovery."[4] The lawyer had testified that Ford did not respond to requests for insurance information "as a matter of course," explaining that "Ford has also had courts say we don't have to produce the information. . . . Where it is an issue and it's required, it has been produced." The Ford lawyer added, "Insurance is rarely an issue in most of the cases that we see where the requests have been asked. The issue is, does Ford have sufficient assets to cover a judgment. When we respond that we do, the issue rarely progresses [from] there." The Youngs had also presented evidence that Ford was aware that in Georgia courts, a jury is supposed to be qualified as to insurers that may be liable for a judgment.

The trial court found that Ford's concealment of its insurance coverage from the Conleys was "willful" and "intentional" and excused the Conleys from being required to request jury qualification with respect to Ford's insurers in order to preserve that issue for later challenge. The court concluded that the Conleys "had no reason to know, or even suspect, that insurance coverage

_____

[4] At the motion for new trial hearing, the Conleys submitted as evidence the transcript of the Young sanctions hearing, without objection from Ford. During that sanctions hearing, the Youngs presented excerpts from the video deposition of Ford's in-house lawyer who managed product liability litigation and previously managed the discovery for all of Ford's litigation nationwide.

existed at the time of trial" and did not have the burden "to ferret out information that was clearly required to be produced under Georgia law." Finally, citing Atlanta Coach Co. v. Cobb, 178 Ga. 544 (174 SE 131) (1934), the court presumed that the Conleys had been harmed by Ford's conduct, because "under Georgia law, the harm is presumed when there is a failure to qualify a jury as to a Defendant's insurance carriers."

### (d)    The Court of Appeals' Opinions

At Ford's request, the trial court certified its new trial order for immediate review, and the Court of Appeals granted Ford's application for interlocutory appeal.  See OCGA § 5-6-34 (b).  However, the Court of Appeals then divided equally on the disposition of the appeal.[5]

In concluding that the trial court's judgment should be affirmed, Presiding Judge Barnes's opinion said that Ford's responses to the Conleys' insurance questions

---

[5] Five judges voted to reverse the trial court's judgment, and a total of five judges voted to affirm; Judges Miller and Dillard were disqualified.  Although the unpublished opinions of Presiding Judge Barnes (joined by Presiding Judge Doyle and Judge McFadden) and Presiding Judge Ellington (joined by Chief Judge Phipps, Presiding Judge Barnes, and Judge McFadden) were both referred to as "dissents" and referred to the opinion of Judge Boggs (joined by Presiding Judge Andrews and Judges Ray, Branch, and McMillan) as the "majority," the equal division of the court means that no opinion was truly a majority or a dissent.  For ease of reference, we will refer simply to the "Barnes Opinion," the "Ellington Opinion," and the "Boggs Opinion."

12

could be interpreted by a reasonable attorney as stating that [Ford] was self-insured, and the fact [that Ford] went on to include the same boilerplate objections it made to virtually every interrogatory and request to produce does not change the fact that the response was misleading and excused the [Conleys] from filing a motion to compel.

Barnes Op. at 3. The opinion added that the failure to qualify the jurors as to Ford's insurers required harm to the Conleys to be presumed under Atlanta Coach, 178 Ga. at 551-552, and Smith v. Crump, 223 Ga. App. 52, 56 (476 SE2d 817) (1996). See Barnes Op. at 3. Emphasizing the deference owed to the trial court's fact finding and discretion in this context, the Barnes Opinion saw no basis to reverse the new trial ruling. See id. at 3-4.

Reaching the same conclusion, Presiding Judge Ellington's opinion observed that

a party should not be able to ignore an opposing party's objections to its discovery requests, take its chances at trial, and then file a motion for new trial at any time . . . . But, by equal measure, a party

13

should not be able to refuse to respond fully and honestly to discovery requests about its insurance coverage — where such information is relevant and necessary to the selection of a properly qualified jury — and also cloak the fact that it is refusing to provide the information as Ford did . . . in this case.

Ellington Op. at 2-3 (footnote omitted). Both the Barnes and Ellington Opinions also argued that the Court of Appeals should follow its recent decision in Reese v. Ford Motor Co., 320 Ga. App. 78 (738 SE2d 301) (2013).[6]

In concluding that the trial court's judgment should be reversed, Judge Boggs's opinion viewed Ford's "arguably incomplete" discovery responses and objections as placing the Conleys "on notice that Ford may have had at least some insurance coverage applicable to [their] claim," noting that the Conleys' letter requesting that Ford lift the objections "indicates that [they were] aware of the deficiencies in Ford's answer and objection." Boggs Op. at 8, 10. The Boggs Opinion said that the trial court therefore erred in finding a misrepresentation by Ford sufficient to excuse the requirements that the Conleys pursue further discovery and object to the jury's not being qualified as to Ford's

---

[6] In Reese, the trial court granted the plaintiffs' extraordinary motion for new trial after proceedings similar to those in this case. See id. at 81. The Court of Appeals affirmed that ruling, holding that the trial court had not abused its discretion because Ford had "intentionally provided misleading discovery responses, which resulted in the jury not being properly qualified." Id. at 80-81. Ford's petition for certiorari in Reese is pending before this Court. See Case No. S13C1019.

insurers. See id. at 11.

Judge Boggs's opinion also focused on the "stringent requirements for the grant of an *extraordinary* motion for new trial," arguing that Reese did not apply those requirements and should be overruled. Boggs Op. at 11-12 (emphasis in original). The Conleys did not satisfy those requirements, the Boggs Opinion concludes, because they failed to exercise due diligence in identifying Ford's insurers and also showed no actual harm from the failure to qualify the jurors as to those insurers, contending that Atlanta Coach's presumption of harm should not apply under these circumstances. See Boggs Op. at 14-15.

Because the Court of Appeals was equally divided, the case was transferred to this Court for decision.

2.    The Standard for Granting an Extraordinary Motion for New Trial

The core issues in this case are the alleged discovery violation involving Ford's responses to requests about its insurance coverage and the effect of that alleged violation on the qualification of the jury that decided the Conleys' case at trial. Those issues are presented, however, in the context of an *extraordinary* motion for new trial in a civil case — the Conleys' effort to obtain a new trial initiated many months after the entry of judgment against them. It is true, as the

Conleys and the Barnes Opinion point out, that appellate courts must accord

substantial deference to a trial court's decision on an extraordinary motion for

new trial. We review the trial court's findings of fact under the clearly

erroneous standard, meaning that we must uphold a finding if there is any

evidence in the record to support it. See Singh v. Hammond, 292 Ga. 579, 581

(740 SE2d 126) (2013). And we review the trial court's ultimate ruling on such

a motion only for abuse of discretion. See Smith v. Smith, 293 Ga. 563, 566

(748 SE2d 456) (2013); Tedoff v. B & L Service Co., 167 Ga. App. 452, 452

(306 SE2d 719) (1983).[7] However, that discretion is not unfettered. As always,

the trial court's discretion must be exercised in conformity with the governing

legal principles, and the facts that the court must find and that we must evaluate

on appeal are those relevant to determining whether the legal requirements were

satisfied. See State v. Pickett, 288 Ga. 674, 679 (706 SE2d 561) (2011) ("If the

---

[7] In its amicus curiae brief in support of Ford, the Georgia Chamber of Commerce argues that we should apply the de novo standard of review because the new trial grant in this case was based on a "special ground" rather than the "general grounds." See Stevens v. Wright Contracting Co., 92 Ga. App. 373, 378-379 (88 SE2d 511) (1955) (treating the failure to qualify the jury as to an insurer as a "special ground"). But special grounds are properly reviewed de novo only when they involve pure questions of law. See O'Neal v. State, 285 Ga. 361, 363 (677 SE2d 90) (2009) (holding that we review "special grounds *involving a question of law . . .* de novo and reverse if the trial court committed *legal error*" (citation omitted; emphasis added)). The Conleys' motion did not present a pure question of law, but rather a mixed question of law and fact to which the abuse of discretion standard applies.

16

trial court significantly misapplies the law or clearly errs in a material factual finding, the trial court's exercise of discretion can be affirmed only if the appellate court can conclude that, had the trial court used the correct facts and legal analysis, it would have had no discretion to reach a different judgment."). Thus, it is appropriate to begin with a discussion of the fundamental requirements that apply in the procedural posture of this case.

The Georgia Code draws a distinction between timely, or ordinary, motions for new trial and untimely, or extraordinary, motions for new trial. The statute generally authorizing motions for new trial says: "All motions for new trial, *except in extraordinary cases*, shall be made within 30 days of the entry of the judgment on the verdict or entry of the judgment where the case was tried without a jury." OCGA § 5-5-40 (a) (emphasis added). Extraordinary motions for new trial are permitted only in limited circumstances. The next section of the Code specifies that "[w]hen a motion for a new trial is made after the expiration of a 30 day period from the entry of judgment, some *good reason* must be shown why the motion was not made during such period, which reason shall be judged by the court." OCGA § 5-5-41 (a) (emphasis added). Thus, when a motion for new trial is untimely, before considering the merits of the

motion, the court must determine if the delay in filing the motion should be excused by good cause.

Untimely efforts to obtain a new trial have long been disfavored by the law because they work to undermine the finality of judgments and the reliance that litigants are normally entitled to place on final decisions rendered in our courts. See Roddenbery v. Roddenbery, 255 Ga. 715, 717 (342 SE2d 464) (1986) ("Extraordinary motions for a new trial are not favored, and a stricter rule is applied to an extraordinary motion for a new trial based on the ground of newly available evidence than to an ordinary motion on that ground." (citations and punctuation omitted)). Accordingly, re-opening judgments in this manner should not be commonplace, but rather is warranted only in truly "extraordinary" circumstances. See Usry v. Cato, 170 Ga. 358, 359 (153 SE 23) (1930) (discussing with approval the trial court's statement that "[a]n extraordinary motion [for new trial] should be granted within the meaning of the word itself, something extraordinary, something unusual, something which entered into the trial of the case and which was not discovered and could not have been discovered [earlier]"). See also Harris v. Hull, 70 Ga. 831, 838-839 (1883) ("It is certainly to the interest of parties, as well as the public, that there

should be an end of litigation. . . . Litigation should never be protracted where this, with due regard to the rights of parties, can possibly be avoided. *Interest rei publicæ ut sit finis litium*[8] is a maxim so old that its origin is hidden in a remote antiquity, and the policy which it inculcates is so essential as not to admit of question or dispute.").

Except for the requirement in OCGA § 5-5-41 (a) that the moving party show a "good reason" for not seeking a new trial within 30 days of the judgment, the requirements for extraordinary motions for new trial are not specified by statute but instead are the product of case law that draws on the statutory requirements for ordinary motions for new trial. See <u>Drane v. State</u>, 291 Ga. 298, 300 (728 SE2d 679) (2012). Both Ford and its amicus discuss the six-part test set forth by this Court for the grant of an extraordinary motion for new trial based on the alleged post-trial discovery of new evidence.[9] However,

---

[8]  Interest rei publicæ ut sit finis litium is Latin for "it concerns the state that there be an end to lawsuits." Black's Law Dictionary 730 (5th ed. 1979).

[9]  The six requirements that must all be met before a motion brought on this ground can succeed are well settled: the moving party must show (1) that the newly discovered evidence has come to his knowledge since trial; (2) that want of due diligence was not the reason the evidence was not acquired sooner; (3) that the evidence was so material it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness is attached to the motion or its absence accounted for; and (6) that the new evidence does not operate solely to impeach the credibility of a witness. See, e.g., <u>Smith</u>, 293 Ga. at 566; <u>Drane</u>, 291 Ga. at 300. See also OCGA § 5-5-23 ("A new trial may be granted in any case where any material evidence, not

19

"'the late filing of a motion for new trial may also be predicated on circumstances other than newly discovered evidence.'" Fowler Properties, Inc. v. Dowland, 282 Ga. 76, 79 (646 SE2d 197) (2007) (citation omitted). See also OCGA § 5-5-25 ("In all motions for a new trial on other grounds not provided for in this Code, the presiding judge must exercise a sound legal discretion in granting or refusing the same according to the provisions of the common law and practice of the courts.").

The Conleys' motion was based on information that they discovered about Ford's insurers after trial, but that is not the type of newly discovered evidence contemplated by the cases cited by Ford and its amicus, because it is not evidence related to witnesses and exhibits that allegedly should have been considered by the jury in reaching its verdict. Instead, the new evidence here implicates the Conleys' right to a "competent and impartial jury," Atlanta Coach, 178 Ga. at 549, by calling into question the jury's qualification to decide the case at all.

Thus, the trial court was not required to apply the test used in cases

merely cumulative or impeaching in its character but relating to new and material facts, is discovered by the applicant after the rendition of a verdict against him and is brought to the notice of the court within the time allowed by law for entertaining a motion for a new trial.").

20

dealing with newly discovered trial evidence, but it was not free to exercise its discretion without constraint. Any party making an extraordinary motion for new trial must meet two fundamental requirements. First, regardless of the basis for an extraordinary motion for new trial, OCGA § 5-5-41 (a) requires the moving party to show a "good reason" why the motion was not filed during the 30-day period after the entry of judgment. Good reason exists only where the moving party exercised due diligence but, due to circumstances beyond its control, was unable previously to discover the basis for the claim it now asserts. See Harper v. Mayes, 210 Ga. 183, 183 (78 SE2d 490) (1953) ("[The] extraordinary state of facts must have been unknown to the movant or his counsel at the time when an ordinary motion for a new trial could have been filed, and impossible. . . to [have been] ascertain[ed] by the exercise of proper diligence for that purpose."). Compare Martin v. Children's Sesame, Inc., 188 Ga. App. 242, 242 (372 SE2d 648) (1988) (holding that "good reason" existed where the plaintiffs filed their motion for new trial five days late because the clerk's office twice informed them that the judgment had been entered five days after it actually was entered), with Mize v. Regions Bank, 265 Ga. App. 635, 636 (595 SE2d 324) (2004) (affirming the denial of an extraordinary motion for

21

new trial where the moving party's mistake in reading the date on an order was "entirely attributable to . . . himself").

Second, before any motion for new trial — timely or untimely — may be granted, the moving party must show that the error alleged as the basis for the motion was materially harmful. See OCGA § 9-11-61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); Atlanta Coach, 178 Ga. at 551 ("This court has several times stated that in order to reverse a judgment both error and injury must affirmatively appear . . . ."); Eberhardt v. Bennett, 163 Ga. 796, 803 (137 SE 64) (1927) ("[I]t is not every error which will warrant the grant of a new trial. To warrant a new trial there must be substantial error, the withholding from a party of a substantial right, which harms him by depriving him of something to which he was entitled in the exercise of his right to a fair and lawful trial."). If the error alleged was not materially prejudicial — if the party was not thereby deprived of a fair trial – then there is no justification for requiring another trial of the same case.

Several decisions of the Court of Appeals demonstrate the application of these two requirements. For example, in Jones v. Cooke, 169 Ga. App. 516 (313

SE2d 773) (1984), the trial court entered a default judgment against the defendant that exceeded the amount the plaintiff had prayed for, which was a violation of OCGA § 9-11-54 (c) (1), and the defendant did not get notice of the judgment until four months after it was entered. See Jones, 169 Ga. App. at 516-517. The Court of Appeals reversed the denial of the defendant's extraordinary motion for new trial, explaining that he "had both an excuse for delay in filing his motion . . . and also a sufficient ground to set aside the verdict and judgment." Id. at 517. In Union Life Ins. Co. v. Aaronson, 109 Ga. App. 384 (136 SE2d 142) (1964), the plaintiff told the defendant that it had requested and received a continuance from the court to allow for settlement negotiations, but the plaintiff did not actually request a continuance, went to trial, and, in the absence of the defendant, introduced evidence and obtained a verdict and judgment in its favor. See id. After the judgment, the plaintiff continued to tell the defendant that it was open to settlement; the defendant learned of the judgment only when a levy was made on his property. See id. The Court of Appeals held that those facts "constitute (a) an excuse for delay in filing so as to authorize the trial judge to entertain and hear the delayed motion [for new trial], and (b) a sufficient ground to set aside the verdict and judgment." Id.

23

In sum, the two basic requirements that the trial court must find to be established before granting any extraordinary motion for new trial are that the error the moving party now asserts (1) could not have been discovered and raised in a timely manner if the party had acted with due diligence and (2) materially harmed the party.

3.    The Conleys' Extraordinary Motion for New Trial

We now consider whether the trial court properly determined that the Conleys met the due diligence and material harm requirements for an extraordinary motion for new trial on the jury qualification ground they raised.

(a)    Due Diligence

It is undisputed that the Conleys *actually* learned that Ford had insurers who could have provided coverage for their case only after Ford's insurance information was revealed during the Young proceedings.  The Conleys then promptly sought a new trial, claiming that the jury in their case should have been qualified as to Ford's insurers.  But the Conleys filed their motion for new trial more than a year after trial, after the jury returned its verdict in favor of Ford, and after the judgment was entered, making it an extraordinary motion.

Ford contends that the Conleys *could* have learned about Ford's insurers

before trial had they exercised due diligence in discovery. As a result, Ford argues, the Conleys waived their right to seek jury qualification as to the insurers at trial and also cannot justify the untimeliness of their motion for new trial. Ford relies on cases like Patterson Bank v. Gunter, 263 Ga. App. 424 (588 SE2d 270) (2003), which held that, "[a]fter verdict, a litigant cannot obtain a new trial by reason of the fact that a juror is disqualified by relationship, unless the litigant can show that before the verdict it and its counsel did not know of the relationship and could not have discovered the relationship by the exercise of ordinary diligence." Id. The trial court, however, found that the Conleys' failure to discover the insurer information earlier was not their fault, but rather was the result of Ford's having intentionally misled the Conleys into believing that Ford had no insurers. That finding is supported by the record.

(1)    Ford's Misleading Substantive Discovery Responses

During the trial proceedings, the Conleys did not overlook the issue of Ford's insurers. In their very first set of interrogatories and document requests, the Conleys asked Ford specifically for information about insurers that could provide coverage for their case, and they asked for that information in discovery requests that were reasonably precise, straightforward, and unambiguous. That

25

was information the Conleys were entitled to obtain under OCGA § 9-11-26 (b) (2), as well as information the Conleys would need to seek qualification of potential jurors under OCGA § 15-12-135 (a) based on relationships with insurance companies that could be liable to pay damages the jury awarded. It is now undisputed that Ford in fact had at least six such insurers. Rather than simply and truthfully providing that information, however, the substantive portion of Ford's answers to the Conleys' discovery requests was as follows: "Ford states it has sufficient resources to cover any judgment which could be reasonably rendered in this case, if any." In context, that statement could reasonably be understood as an assertion that Ford was self-insured and did not have any insurers who could be liable for a judgment in this case.

The record also shows that Ford *intended* its substantive responses to be understood in this way. In the <u>Young</u> case, Ford offered an almost identical substantive discovery response: "Ford has sufficient resources to satisfy any judgment that reasonably could be expected to be awarded as damages in this action, if any." And Ford's attorney (one of the same lawyers as in this case) told the trial court (the same judge as in this case) that this response meant that Ford had no insurers who could be liable for a judgment, saying that "consistent

26

with our discovery responses . . . there is no insurance that would be applicable to satisfy a judgment in this case." Ford had also said that it had "sufficient resources to satisfy any [reasonable] judgment" as its reason for objecting to the Youngs' pretrial order requesting qualification of jurors as to Ford's insurers.[10]

(2)    Ford's Objections

But Ford's substantive responses did not stand alone in this case, as they did in Young. As Ford and the Boggs Opinion emphasize, the substantive portion of the response to both Interrogatory No. 5 and Document Request No. 10 was preceded by the phrase, "[s]ubject to and without waiving [Ford's] objections," and was followed by objections on the ground that the request was "overly broad," sought "irrelevant" information, and, to the extent it asked for more information than Ford was providing, sought "confidential or proprietary" information. Judge Boggs's opinion concluded that these objections placed the Conleys "on notice that Ford may have had at least some insurance coverage." Boggs Op. at 10. Ford's objections do make this a more complicated case, but

_____

[10]  It is worth noting that the trial judge in Reese – a different judge than in this case and Young – interpreted an almost identical discovery response by Ford "as meaning that Ford was entirely self-insured" and similarly found that the response was "designed to be misleading." Reese, 320 Ga. App. at 80.

27

they do not alter our conclusion as to how Ford's answers could reasonably be interpreted.

If Ford had simply denied the existence of insurance without objection, this would be an easy case for the Conleys to show due diligence. Where a party simply answers a discovery request, the requesting party is entitled to believe the answer. Due diligence does not require the requesting party to disbelieve the substantive answers an opposing party has provided in discovery, nor must the requesting party file a motion to compel and then show non-compliance with an order to compel before the trial court can sanction the responding party for its discovery abuse, as must be done if the responding party refuses to answer the request at all. See OCGA § 9-11-37; MARTA v. Doe, 292 Ga. App. 532, 537 (664 SE2d 893) (2008) ("'To condone [false or erroneous responses] would force parties to assume the falsity of every sworn interrogatory response and file endless motions preserving their right to relief.'" (citation omitted)). As our Court of Appeals has cogently explained, in accord with the position of courts nationwide:

> An interrogatory answer that falsely denies the existence of discoverable information is not exactly equivalent to no response. It is *worse* than no response. When there is no response to an

28

interrogatory or the response is devoid of content, the party serving the interrogatory at least knows that it has not received an answer. It can move the court for an order to compel a response. . . . If the response is false, however, the party serving the interrogatory may never learn that it has not really received the answer to the interrogatory. . . .

Id. at 536 (citation omitted; emphasis in original).

On the other hand, if Ford had responded to the Conleys' insurance inquiries *only* with its objections, instead of with answers qualified by the objections, this would be an easy case in Ford's favor, as the Conleys would not be heard to complain now that Ford led them to believe that it had no insurers. If a party responds to a discovery request simply with objections to the request, the requesting party is given no substantive answer at all. In this situation, the law is clear: if the requesting party wants an answer upon which it can rely (or sanctions for the failure to provide such an answer), it must file a motion to compel, obtain an order from the court compelling an answer, and then seek sanctions if the responding party still refuses to comply. See OCGA § 9-11-37; Strejc v. MARTA, 197 Ga. App. 88, 89 (397 SE2d 501) (1990).

Because Ford coupled its substantive answers with objections, this case does not fall neatly into either of these easier scenarios. The trial court

reasonably concluded, however, that even with the objections, Ford's answers were misleading. The Conleys were not required to read Ford's objections as a distinct refusal to say whether or not Ford carried insurance to cover the Conleys' claim, because the substantive responses that Ford provided could reasonably be understood to indicate that the company was self-insured. Moreover, the objections asserted by Ford suggest this understanding of the substantive responses. If Ford carried insurance policies, Ford could not reasonably refuse entirely to provide any information about them, in light of OCGA §§ 9-11-26 (b)(2) and 15-12-135 (a). Moreover, the objections that any further information about which resources Ford would use to cover a judgment was irrelevant, proprietary, or confidential are difficult to understand with respect to, for instance, the identity of a third-party insurer. Such objections would make much more sense if Ford were truly self-insured. Thus, the Conleys, and the trial court, could read Ford's discovery responses, as a whole, as asserting that Ford was self-insured and would not look to any insurance policy to cover a judgment in this case. The Conleys, having no reason to suspect those responses were false, were not obliged to question them or to seek different responses. The Conleys asked; Ford answered; and the Conleys were

30

entitled to rely upon those answers as truthful, rather than going to the trial court to compel Ford to answer again.

(3) The Conleys' Understanding of Ford's Responses

Even if the Conleys could *reasonably* (objectively) read Ford's discovery responses as indicating, misleadingly, that Ford had no insurers, if the Conleys *actually* (subjectively) believed that Ford was non-responsive on the insurance issue, they would not be entitled to a new trial. If that were the case, due diligence would have obliged the Conleys to move to compel Ford to properly answer the requests. See Strejc, 197 Ga. App. at 89. Ford contends that the Conleys' understanding that the responses to Interrogatory No. 10 and Document Request No. 5 were evasive or incomplete, rather than misleading, is demonstrated by the March 1, 2008 letter the Conleys sent to Ford complaining about the company's responses to the initial set of discovery requests. That letter is Ford's best piece of evidence, but it does not compel a different conclusion than the trial court reached.

The Conleys' March 2008 letter, which was sent about six weeks after receiving Ford's responses, was not focused on the interrogatory and document request seeking insurance information. Instead, the letter asked Ford to

31

"withdraw all general objections that it incorporates into each interrogatory," noting that "Ford has basically lodged an objection to each interrogatory." The letter also asked Ford to "withdraw the specific objections and answer the questions posed instead of providing self-serving answers that do not respond to the question posed" for 19 interrogatories (including No. 5), and further requested that Ford withdraw its objections to and answer 15 other interrogatories for all vehicles, meaning that the Conleys requested answers without objections for 34 of the 37 interrogatories to which Ford had objected. Finally, the letter requested that Ford "withdraw specific objections, respond to the requests as written, . . . and/or fully respond to" 54 of the 68 document requests to which Ford had objected (including No. 10).

Thus, the Conleys' letter was not directed at the two discovery requests regarding insurance, but rather was a broadside complaint about Ford's objection-laden responses, which essentially asked Ford to review the initial set of discovery requests again and to answer the questions without the blunderbuss objections. Indeed, Ford acknowledged the unfocused nature of the Conleys' letter in its March 21 reply, which said the Conleys had raised "general, broad complaints regarding Ford's answers and objections but fail[ed] to address

particular interrogatories with the specific grounds for [their] complaints." As time went on and the Conleys focused more precisely on the initial responses that Ford had provided, the Conleys could reasonably conclude, for the reasons discussed previously, that Ford had asserted that it was self-insured and that no further information about such self-insurance was required.

To support the argument that the Conleys did not diligently pursue insurance information, Ford also points out that the Conleys filed three motions to compel other information sought in discovery. Those three motions, which were filed much later in the pretrial period, show that the Conleys knew how to seek to compel discovery. But the motions do not indicate that the Conleys were ferreting out misinformation provided by Ford and demanding that it be corrected, much less that the Conleys knew that Ford's initial answers regarding its insurance coverage — as the Conleys reasonably understood those answers — were incomplete or untrue. None of the motions sought to compel further responses to the Conleys' initial interrogatories and document requests; they instead addressed subsequent discovery items that Ford had unambiguously

refused to produce and questions Ford had squarely refused to answer.[11]

(4)     Deference to the Trial Court

The trial court's finding that Ford's discovery responses intentionally misled the Conleys into actually and reasonably believing that Ford had no insurers is entitled to substantial deference on appeal. Unlike this Court or the Court of Appeals, the trial court directly supervised the ebb and flow of the discovery and trial process in this case and had the opportunity to observe and assess the conduct, demeanor, and credibility of the parties and their counsel throughout the proceedings, as well as the witnesses presented on this specific issue at the motion for new trial hearing. See Singh, 292 Ga. at 581 ("'[T]his Court properly gives due deference to the opportunity of the trial court to judge the credibility of the witnesses.'" (citations omitted)); Resource Life Ins. Co. v. Buckner, 304 Ga. App. 719, 734 (698 SE2d 19) (2010) ("'[T]rial judges, through their direct involvement with the case, the parties, and the attorneys, and their familiarity with the actions of the parties in the conduct of discovery in

---

[11] The first motion sought to compel the depositions of two engineers to which Ford had consistently objected. The second motion sought to compel Ford's answers to the Conleys' third set of interrogatories and twelfth set of document requests after Ford "stated unequivocally that it will not be answering any of this discovery" on the ground that it was untimely. The final motion sought to compel video clips and test protocols that Ford had repeatedly failed to produce.

34

similar cases that are properly brought to their attention, are in the best position to evaluate the parties' conduct and to determine the appropriate level of [discovery] sanctions.'" (citation omitted)); Santora v. American Combustion, Inc., 225 Ga. App. 771, 772 (485 SE2d 34) (1997) ("In determining whether a party has abused discovery, the trial court sits as trier of fact, and this Court will uphold a finding of wilful discovery abuse if there is any evidence to support it.").

Ford maintains that the trial court's involvement in the Young case impermissibly colored its decision in this case and the court "conflated the two proceedings." It is true that the trial court found that Ford's discovery responses were intentionally misleading based in large part on the deposition testimony of Ford's in-house lawyer introduced during the sanctions hearing held in Young. But the court was entitled to consider that evidence, because the Conleys admitted the transcript of the Young hearing at the motion for new trial hearing in this case without objection by Ford.

Ford further claims that the trial court failed to consider that in this case, unlike in Young, Ford objected to the requests for insurance information. In fact, the court specifically acknowledged Ford's argument that the Conleys

should have known that the company had insurance "based upon Ford's objections to Plaintiffs' discovery requests seeking disclosure of insurance information." The court simply did not find those objections sufficient to put the Conleys on notice that Ford might have insurers — a finding with which we agree, as discussed previously, because the objections were made alongside substantive answers that reasonably could be read to indicate that Ford was self-insured, and indeed, the objections could be understood to suggest that very reading of the substantive answers.

Ford also quarrels with the trial court's statement that Ford's in-house counsel testified to "a general corporate practice" of not disclosing insurance information in discovery, asserting that "[t]he actual testimony was that Ford had produced insurance information where Ford's objections had been overruled." But Ford's lawyer testified that insurance information "isn't produced as a matter of course in our cases," indicating that the general practice of the corporation was to refuse to provide insurance information when first requested even in states, like Georgia, where such information should be disclosed if requested. The trial court's statement was therefore a fair characterization of the evidence.

36

As indicated by the equal division of the Court of Appeals, whether the Conleys exercised due diligence in this case is a pretty close question, and the trial court could have reached a different conclusion, to which we likely also would have deferred. But the conclusion the trial court reached is supported by the record viewed as a whole. Ford's responses to the Conleys' initial discovery requests for insurance information affirmatively misled the Conleys into actually and reasonably believing that Ford was entirely self-insured for any judgment in their case, and the Conleys therefore did not fail to act with due diligence in not moving to compel further responses from Ford, in not asking the trial court to qualify the prospective jurors as to insurers that Ford had failed to identify, and in not moving for a new trial until after the truth about Ford's insurers was revealed during the subsequent Young litigation. See Aaronson, 109 Ga. App. at 384 (finding good cause for the untimely filing of a motion for new trial where the movant failed to present evidence at trial because he was misled by the other party into believing that the trial had not yet happened). Accordingly, the Conleys did not waive their right to qualify the jury as to Ford's insurers that may have been liable for a judgment, and the Conleys have met the due diligence requirement for the grant of an extraordinary motion for new trial.

37

(b)     Material Harm

To obtain a new trial, in addition to showing that they had good reason for the late filing of their motion for new trial, the Conleys were required to show that the error they identified caused them material harm. This is usually a difficult showing to make, but it is not for the particular claim that the Conleys presented, as the trial court correctly held. When the error is the failure to qualify the jurors in a civil trial as to their relationship with the defendant's insurers that may be liable for a judgment, then after the verdict is returned, harm must be presumed.

Ford's in-house counsel testified that the company routinely answered discovery requests for insurance information by saying that Ford had sufficient resources to cover any reasonable judgment, and that opposing parties generally found that response sufficient. Ford may be right that such an answer is sufficient to satisfy the main purpose of OCGA § 9-11-26 (b) (2), because plaintiffs like the Conleys are notified that Ford will be able to pay an adverse judgment or settlement in the case (whether directly or from insurance).[12] In

---

[12] OCGA § 9-11-26 (b) (2), which was added to the Georgia Civil Practice Act in 1972, see Ga. L. 1972, p. 510, § 1, tracks an amendment to the Federal Rules of Civil Procedure enacted in 1970. That amendment resolved uncertainty as to whether insurance information had to be disclosed

38

Georgia, however, information about a civil defendant's insurers is required for a second, and perhaps even more important, purpose: qualifying the jury. Ford's national discovery practice apparently failed to take into account Georgia's rule and the right it provides to plaintiffs.

It is the longstanding rule in Georgia that, to ensure the right of trial by an impartial jury, a party to a civil case is entitled to have the jury qualified by the court as to any insurance carrier with a financial interest in the case. See Atlanta Coach, 178 Ga. at 549-550; Weatherbee v. Hutcheson, 114 Ga. App. 761, 764 (152 SE2d 715) (1966) ("It is proper to qualify the jury relative to the possible interest which the members may have in an insurance carrier having a financial interest in the outcome of the suit."). See also OCGA § 15-12-135 (a) ("All trial jurors in the courts of this state shall be disqualified to act or serve in any case or matter where such jurors are related by consanguinity or affinity to any

_____

in discovery in favor of disclosure, on the ground that "[d]isclosure of insurance coverage will enable counsel for both sides to make the same realistic appraisal of the case, so that settlement and litigation strategy are based on knowledge and not speculation." Fed. R.Civ. P. 26 Advisory Committee's Note, 1970 Amendment. For more than 20 years now, insurance agreements have been included in the initial disclosures that must be made in most federal civil cases without even awaiting a discovery request. See Fed. R. Civ. P. 26 (a) (1) (A) (iv). See also Fed. R. Civ. P. 26 Advisory Committee's Note, 1993 Amendment ("As the functional equivalent of court-ordered interrogatories, this paragraph requires early disclosure, without need for any request, of four types of information that have been customarily secured early in litigation through formal discovery."). OCGA § 9-11-26 has not been amended to require such initial disclosures without request.

party interested in the result of the case or matter . . . .").  It is an equally longstanding Georgia rule that where a civil jury was not properly qualified in this way, and where the party seeking such qualification has properly preserved the issue for review, prejudice to that party will be presumed, and in the absence of proper rebuttal, a new trial must be ordered.  See Atlanta Coach, 178 Ga. at 550-552.

> The issue is not whether or not the juror can be fair and impartial while having the interest; if this were the issue, then ignorance would prevent prejudice. The issue is the per se disqualification under OCGA § 15-12-135, as a matter of law, with the presumption of prejudice.

Smith v. Crump, 223 Ga. App. at 56.

The reason for this unusual presumption of harm involves yet another longstanding Georgia rule — the prohibition against jurors impeaching their verdict by showing their own disqualification.  See Atlanta Coach, 178 Ga. at 551-552; Reece v. State, 208 Ga. 690, 691 (69 SE2d 92) (1952) ("It is well settled, as a matter of public policy, that a juror will not be heard to impeach his verdict by showing his own incompetency or disqualification."); former OCGA § 9-10-9 ("The affidavits of jurors may be taken to sustain but not to impeach

40

their verdict.").[13] In voir dire, prospective jurors may be questioned about their relationships with insurers that face potential liability from a judgment in the case and may provide truthful answers, whatever they may be; but once the jury is seated and renders its verdict, although jurors could testify to a lack of disqualifying relationships, they could not impeach the verdict by testifying to any disqualifying relationship.

Thus, the party seeking to examine the jury regarding disqualifying ties to insurance companies must be permitted to pose the questions before the verdict, and an error in this regard cannot be cured or deemed harmless after verdict.

> If the plaintiff was entitled to have the examination as to relationship conducted in open court and before verdict while the jurors were competent to testify against as well as for their

---

[13] This case was tried under Georgia's old Evidence Code, which applied to trials commencing before January 1, 2013. See Ga. L. 2011, p. 99, § 101. The statutory limitation on questioning jurors after their verdict is now found in OCGA § 24-6-606 (b), which says:

> Upon an inquiry into the validity of a verdict or indictment, a juror shall not testify by affidavit or otherwise nor shall a juror's statements be received in evidence as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the jury deliberations or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith; provided, however, that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the juror's attention, whether any outside influence was improperly brought to bear upon any juror, or whether there was a mistake in entering the verdict onto the verdict form.

qualification, the error in denying this right was not cured by the submission of affidavits procured by the defendant out of court and after verdict, when the jurors could legally testify only one way on the question, and by offering to permit the plaintiff to make a counter-showing [that cannot legally be made].

Atlanta Coach, 178 Ga. at 552. See also Lewis v. Emory Univ., 235 Ga. App. 811, 815 (509 SE2d 635) (1998) ("[T]he law itself provides the negative factual answer [after verdict], without an opportunity to discover whether it is true factually or not.").[14] In short, if prejudice were not presumed in this way, a trial court's improper ruling refusing to allow jurors to be qualified as to insurers would be immune from correction on appeal after verdict.

Ford seeks to avoid the application of Atlanta Coach in three ways, none of which are convincing.

(1)    First, Ford points out that Atlanta Coach involved a timely request to the trial court to qualify the jury as to the defendant's insurer, which was erroneously denied; Judge Boggs's opinion adds that in Atlanta Coach and some similar cases granting new trials, not only was a timely objection to the lack of

---

[14] Thus, contrary to the suggestion of Justice Melton's concurrence, only juror affidavits or similar evidence obtained *before* the verdict could rebut the presumption of harm from a failure to properly qualify the jury. See Wallace v. Swift Spinning Mills, Inc., 236 Ga. App. 613, 615 (511 SE2d 904) (1999) ("Such presumption must be rebutted, if at all, prior to the verdict."). As the trial court correctly noted, Ford has offered no such evidence seeking to rebut the presumption of prejudice to the Conleys.

jury qualification made at trial, but a timely new trial motion was filed challenging that ruling. See Boggs Op. at 15. In this case, by contrast, the jury qualification issue was first raised in an untimely, extraordinary motion for new trial.

The *timeliness* of the challenge, however, goes to the issues of waiver and due diligence, not harm. And as discussed in the previous subdivision, the Conleys' failure to raise the issue of qualifying Ford's insurers earlier was excused because Ford misled them into believing no such issue existed. As for *harm*, the same reasoning that supports a presumption of harm when the failure to properly qualify a jury is raised in an ordinary motion for new trial requires the same presumption to be applied in an extraordinary motion: in both situations, without presuming such harm, errors regarding jury qualification would be immune from correction, because after the verdict, the party entitled to jury qualification would be precluded from showing actual harm by the rule prohibiting jurors from impeaching their verdict. Accordingly, we see no reason to distinguish between ordinary and extraordinary motions for new trial in this regard.

This conclusion is consistent with the Court of Appeals's decision in

<u>Patterson v. Lauderback</u>, 211 Ga. App. 891 (440 SE2d 673) (1994), overruled on other grounds by <u>Warren v. Ballard</u>, 266 Ga. 408, 410 (467 SE2d 891) (1996). <u>Patterson</u> held that the <u>Atlanta Coach</u> presumption of harm applied in reversing the denial of an *extraordinary* motion for new trial based on the failure to qualify the jury as to the defendant's insurer. See <u>Patterson</u>, 211 Ga. App. at 894-896. The plaintiffs' failure to raise the claim sooner was excused because defense counsel misled the trial court into believing the insurer was a stock company rather than a mutual company as to which qualification as to juror policyholdings would be necessary, and the plaintiffs made a diligent effort after trial to discover and produce evidence that the insurer was in fact a mutual company. See id. The Court of Appeals concluded, "Defense counsel may state he does not know, or is not sure, but he may not provide erroneous [insurer] information upon which the trial court relies, and escape responsibility for resulting error in the qualification of the jury." Id. at 896. The same can be said of erroneous insurer information provided by the defendant in discovery, upon which the plaintiffs reasonably rely, as occurred in this case.[15]

---

[15] Ford contends that the requirement of showing harmful error has been applied to jury qualification-based motions for new trial, but the company cites only felony criminal cases. See <u>Allen v. State</u>, 235 Ga. 709, 714 (221 SE2d 405) (1975) ("There was no showing that any juror who

44

(2)    Ford next points out that the right to challenge juror qualifications may be waived, and when so waived, it is conclusively presumed that no harm resulted:

> The disqualification of a juror . . . may be expressly or impliedly waived by a party having cause to complain, and if expressly or impliedly waived, it is conclusively presumed that no harm or

tried appellant was so related. A new trial, therefore, will not be granted without a showing of harm."); Peek v. State, 247 Ga. App. 364, 366 (542 SE2d 517) (2000). It is true that in 1899, this Court held that a defendant seeking a new trial based on a failure to properly qualify the jury in a felony case must prove that there was, in fact, a juror who was disqualified. See Carter v. State, 106 Ga. 372, 377 (32 SE 345) (1899). Carter and its progeny involved felony cases, however, and in Atlanta Coach, this Court expressly distinguished civil and misdemeanor cases, where the harm from failure to qualify the jury is presumed, from felony cases, where the defendant must prove actual harm. See Atlanta Coach, 178 Ga. at 555 ("[A] different rule for the selection of a jury applies in felony cases from that which obtains in civil and misdemeanor cases."). Under Georgia statutory law at that time, the parties in a civil or misdemeanor case were entitled to a panel of 24 "competent and impartial jurors from which to strike a jury," whereas parties in a felony case were entitled only to have the trial court "impanel[ ] forty-eight jurors" whom they could then question and seek to disqualify. Id. at 555-556. The Court reasoned that in civil and misdemeanor cases, the error was the failure of the trial court to qualify the jury panel, but the error in a felony case involved "the disqualification itself, and not the [court's] refusal to make inquiry," because the parties did not have the legal right for the panel to be pre-qualified by the court. Id. at 556.

Although Carter was relied on in Allen, it has not been cited by this Court in almost 40 years, and under the reasoning of Atlanta Coach, it is not clear whether the holding in Carter survived the 1951 change in the ability of parties in criminal cases to challenge jurors, which provided, in part, that "[i]n all criminal cases both the State and the defendant shall have the right to an individual examination of each juror from which the jury is to be selected prior to interposing a challenge." Ga. L. 1951, p. 214, § 2 (now codified as OCGA § 15-12-133). This Court has read that language to mean that a "defendant in a felony case is entitled to have 48 *qualified* jurors put upon him." Britten v. State, 221 Ga. 97, 100 (143 SE2d 176) (1965) (emphasis added). In any event, to decide this case, which involves the failure to qualify a jury in a civil case, it is sufficient to recognize that Carter's holding, even if still good law, never applied to civil cases.

As for Peek, that was a felony case that did not rely on Carter or involve a claim that the jury should have been qualified generally as to a particular type of relationship. Instead, the Court of Appeals rejected the argument that the defendant's stepfather had been improperly allowed to sit on the jury on the ground that nothing in the record showed that the juror actually was the defendant's stepfather. See 247 Ga. App. at 366.

45

> benefit to either party resulted from the disqualification, and where it appears that the party having cause to complain either knew of the relationship or could have discovered it by the timely exercise of ordinary diligence, and remained silent, that party will be presumed to have waived the disqualification.

Lewis v. State, 291 Ga. 273, 275 (731 SE2d 51) (2012) (citation omitted).  See also Citizens & Southern Nat. Bank v. Haskins, 254 Ga. 131, 138 (327 SE2d 192) (1985) (holding that the plaintiffs had shown no harm from the failure to qualify the jury as to banking relationships with the defendant bank, when the plaintiffs failed to object to the omission of that qualification at trial); Bean v. Barron, 176 Ga. 285, 285 (168 SE 259) (1933) ("'When parties are furnished with a list of the jury, it is their duty, *if they know* that any of the jurors are disqualified, to call attention to the same, or the disqualification will be held to have been waived.'" (citation omitted; emphasis added)).

Once again, however, this is not a case in which the Conleys either knew of the ground for qualifying the jury that they now raise, or could have discovered that ground by the timely exercise of ordinary diligence, before the jury was empaneled.  The Conleys are not complaining about the failure to qualify the jury as to relationships with specific persons or entities that the Conleys knew or should have realized had an interest in the case, like the parties

46

or counsel that appeared on their behalf or witnesses identified on lists exchanged before trial. Compare, e.g., Usry, 170 Ga. at 360; Hardy v. Tanner Med. Center, Inc., 231 Ga. App. 254, 255-256 (499 SE2d 121) (1998). Instead, the Conleys complain that the jury should have been qualified as to Ford's insurers. As to that issue, as discussed in Division 3 (a) above, the Conleys did not know whether and with whom Ford had insurance coverage for their case; the Conleys acted diligently in asking for such information in their initial discovery requests; Ford's answers affirmatively misled the Conleys into believing that Ford was self-insured; and the Conleys therefore were excused from raising this qualification issue with the trial court before the jury was selected.

(3) Finally, Ford forthrightly asks this Court to overrule Atlanta Coach. Ford contends that Atlanta Coach has been subject to criticism in the Court of Appeals, citing Floor Pro Packaging, Inc. v. AICCO, Inc., 308 Ga. App. 586, 588 (708 SE2d 547) (2011), and Presiding Judge Beasley's special concurrence in Franklin v. Tackett, 209 Ga. App. 448, 450-454 (433 SE2d 710) (1993). In Floor Pro, the Court of Appeals held that for corporations other than an insurer of a party, the presumption of harm arises only where the proponent of

47

qualification showed "a strong probability" that the corporation had "a direct, demonstrable financial stake in the outcome of the case." 308 Ga. App. at 588. The court did not question Atlanta Coach's presumption of harmful error when the jury is not qualified as to insurance companies that directly insure a party. See id.

The special concurrence in Franklin challenged the view that a jury should be qualified based on a party's insurers when the jury is unlikely to discover who those insurers are or even if the party has insurance during the trial, observing that "[w]ithout the link of knowledge, there is no *disqualifying* interest, because the interest will not affect the decision-making." 209 Ga. App. at 453 (Beasley, P. J., concurring specially) (emphasis in original). Thus, the concurrence highlighted the problem that *asking* jurors if they are related to a particular insurer, as Atlanta Coach suggested, communicates to the jury that the insurer's interests are at stake in the case, potentially creating a need for disqualification that would not exist and injecting the issue of insurance into the case even though evidence of a defendant's insurance coverage has long been prohibited in tort trials. See Franklin, 209 Ga. App. at 450-451 (Beasley, P. J., concurring specially). Presiding Judge Beasley suggested that questioning

48

potential jurors about their employment and stock interests would be a better, more circumspect way to discover their connections to insurance companies. See id. at 453.

In several cases after Franklin, the Court of Appeals debated whether a defendant's specific insurers should be directly identified in qualifying the jury. Compare, e.g., Arp v. Payne, 230 Ga. App. 840, 841 n. 2 (497 SE2d 810) (1998) ("[T]he better approach would be to question the jury as to any financial interest in the outcome of the case without directly identifying the insurer.'" (citation omitted)), and Patterson, 211 Ga. App. at 895 n. 2 (noting that trial courts have discretion to qualify jurors as to insurer relationships by following Presiding Judge Beasley's suggestions or using written juror questionnaires to discover such disqualifications rather than doing so orally in the presence of all jurors), with Arp, 230 Ga. App. at 841 (Pope, P. J., concurring specially) ("[F]ailing to qualify prospective jurors regarding any relationship they might have with a specific insurer having an interest in the outcome of a case, itself, poses its own risk to the right of trial by an impartial jury."), and Smith v. Crump, 223 Ga. App. at 55-56 (squarely rejecting Presiding Judge Beasley's position, explaining that jurors may learn the identity of a defendant's insurers at trial in ways other

than through voir dire). None of those cases, however, advocate overruling Atlanta Coach or challenge its holding that harm must be presumed when a jury was not qualified as to a defendant's insurers.

The question presented in this case is not whether there is any way to adequately qualify jurors in civil cases as to a defendant's potentially liable insurers short of directly asking the jurors about relationships with the particular insurance companies at issue. The question is whether to reconsider the rule that harm to the plaintiff must be presumed where, as here, there was a *complete* failure to qualify the jury as to a defendant's insurance carriers — a rule based, as explained above, on the need to provide a remedy to plaintiffs who are not permitted to show actual harm because that would require them to impeach the jury's verdict. That rule has been the law in Georgia for 80 years now, and we see no compelling reason to change it at this time.

(c)    Conclusion

Because the Conleys acted with due diligence to raise their claim that the jury should have been qualified as to Ford's insurers, because the jury should have been so qualified, and because the failure to do so raises an unrebutted presumption that the Conleys were materially harmed, the trial court did not

abuse its discretion in granting the Conleys' extraordinary motion for new trial on this ground.

    4.    <u>The Trial Court's Pretrial Order</u>

The trial court indicated that the Conleys also were entitled to a new trial on the ground that Ford violated the court's scheduling order, which required the parties to prepare a consolidated pretrial order pursuant to the Uniform State Court Rules. The court asserted that the pretrial order obligated "each party to disclose the individuals or entities for which the jury should be qualified," and concluded that Ford violated this obligation by not disclosing its insurers that could be liable for a judgment. We disagree.

Neither the statute regulating pretrial orders, see OCGA § 9-11-16, nor the uniform court rule regarding pretrial orders, nor the case law requires a party to ask the trial court to qualify the jury *on behalf of its adversary*. Like its superior court counterpart, Uniform State Court Rule 7.2 (4) requires each party to file a proposed pretrial order in which the party must, among other things, complete the statement: "The jury will be qualified as to relationship with the following: _____." This allows a party to list all of the individuals and entities, including insurers, that *the party* wants the court to consider in qualifying the

51

jury, and indeed the party's failure to do so may waive its right to complain later about the failure to so qualify the jury. See <u>Dept. of Human Resources v. Phillips</u>, 268 Ga. 316, 318, 320 (486 SE2d 851) (1997); <u>Thurmond v. Bd. of Commrs. of Hall County</u>, 174 Ga. App. 570, 571 (330 SE2d 787) (1985).[16]

Rule 7.2 does not indicate, however, that a party must list in the pretrial order individuals and entities as to which it believes *the other party* might want the jury qualified. For the proposition that such an obligation exists, the Conleys relied at oral argument on <u>Phillips</u>, but that case just says generally that "[t]he Code imposes a duty on each party to assist the trial court in formulating the pretrial order by defining the issues for trial, and deciding 'such other matters as may aid in the disposition of the action.'" 268 Ga. at 318 (quoting OCGA § 9-11-16 (a)). The trial court cited only <u>Weatherbee v. Hutcheson</u>, 114 Ga. App. 761, hn. 1 (152 SE2d 715) (1966), which reiterates that it is "proper" for the court to qualify the jury in a negligence action as to the defendant's insurers, adding that the court "should inquire as to the existence of insurance

---

[16] Ford cites such waiver cases in arguing that the Conleys' failure to ask the trial court to qualify Ford's insurers in the pretrial order waived their right to complain about the lack of qualification in their motion for new trial. But the Conleys' waiver in this regard is again excused because Ford affirmatively misled them into believing that Ford had no such insurers. See Division 3 (a) above.

52

and the name of the company, or comp[anies], so that the information will be available for qualifying the jury," and "[w]hen requested by the court, counsel should make full and fair disclosure of the [insurance] information," so long as that colloquy occurs outside the presence of the jury. Id. But in this case — unlike in Young — there is no evidence that the trial court ever made such a specific inquiry about Ford's insurers. No case cited to us, or that we have found, holds that a party with insurers that may cover the claims against it has an affirmative duty to volunteer that information to the court in the pretrial order (or otherwise), much less that the failure to do so warrants a new trial. We therefore hold that the trial court erred as a matter of law to the extent that the court ruled that the Conleys were entitled to a new trial because Ford failed to list its insurers in the pretrial order.

On the other hand, it is clear that a party may, if it chooses, list its own insurers in the pretrial order, thereby unambiguously notifying the opposing party and the trial court of the potential jury qualification issue and insulating itself from challenge on the issue if the court then qualifies the jury as to those insurers or if the opposing party fails to object to the lack of such qualification. At a minimum, in drafting its pretrial order and reviewing the Conleys' draft,

and in discussing the pretrial order with the trial court, Ford was required to focus on the issue of jury qualification, and indeed the consolidated pretrial order listed numerous individuals, entities, and witnesses as to whom the parties wanted the jury qualified.

In this regard, Ford — the party corporation, if not its trial counsel at that point in time — indisputably knew that it had insurers which were liable to cover a reasonable judgment in this case, and Ford was charged with knowledge of the law — that under settled Georgia law, the trial court's failure to qualify the jury as to such insurers would be deemed harmful error if raised after a defense verdict, unless it was then concluded that the Conleys were aware or should have been aware of the insurers. Thus, while the pretrial order did not obligate Ford to list its insurers, Ford had good reason and ample opportunity at these points of the pretrial process to ensure that the Conleys (and the court) understood that Ford in fact had numerous insurers, and in making its overall findings regarding what the Conleys understood about Ford's insurance coverage and what Ford intended the Conleys to understand, the trial court could take into account the parties' failure to address Ford's insurance with respect to the pretrial order.

5. Conclusion

We close by addressing the contention of Ford and its amicus that if we affirm the trial court's ruling, the floodgates will be opened for countless more extraordinary motions for new trial to be granted, and final judgments undermined, where parties who lost at trial comb back through discovery materials and find some vague response to use as the basis for such a motion. However, outside the circumstances of this case, which we certainly hope are unusual, such efforts are unlikely to be successful, because of the strict requirements for granting extraordinary motions for new trial that we have reiterated in Division 2 above.

To begin with, absent good evidence, and a finding by the trial court, that the opposing party's discovery responses, made in response to reasonably precise, straightforward, and unambiguous requests, were not just vague or incomplete but *affirmatively misleading*, the moving party will normally be unable to explain why it did not pursue a definitive response with a motion to compel and therefore will not be able to satisfy the due diligence requirement. We fully agree with Ford that "[a] party can not during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain

later." Johnson v. State, 282 Ga. 96, 98 (646 SE2d 216) (2007) (citation and punctuation omitted). A party that ignores a discovery violation or jury qualification issue of which it is aware — or of which it should be aware — at the time of trial waives the right to rely on that issue in a motion for new trial, and such waiver will indeed defeat many new trial motions. See, e.g., Sibley v. Dial, 315 Ga. App. 457, 459 (723 SE2d 689) (2012) (holding that Sibley waived his complaint that, "although prospective jurors were asked about their relationship with [the defendant's insurer] State Farm, they were asked without having taken the statutory oath," because "Sibley and his lawyer knew that prospective jurors had been qualified as to any relationship with State Farm outside their presence, but they failed to object to this procedure or to even inquire whether the oath had been administered before the prospective jurors had been so qualified"). In this case, however, the Conleys' awareness of Ford's insurers was precluded by Ford's misleading discovery responses.

We also note in this respect that Ford and its amicus have offered no evidence that discovery responses that courts would find to be affirmatively misleading are routinely made. Ford does not admit engaging in such a discovery practice even in this case, much less on a regular basis, and the amicus

56

does not suggest that the businesses for whom it speaks frequently commit discovery violations that can and would be reasonably construed by courts as providing false and misleading answers. Indeed, there is no indication that other defendants in Georgia civil cases have engaged in Ford's former practice — we assume it has now been stopped — of customarily indicating that the defendant is self-insured (sometimes with obfuscating objections) when asked for basic and entirely appropriate information about insurance coverage for claims. In the absence of evidence to the contrary, we hesitate to broadly attribute a lack of fundamental honesty and professionalism in discovery practice to litigants and lawyers in this State. Moreover, we trust our trial courts to review claims of such misconduct carefully to ensure that the requirement to diligently pursue requested discovery, and to bring complaints about discovery and other matters to the attention of the court in a timely fashion, are not eroded.

Even if the moving party could satisfy the due diligence requirement, the party must also show harm from the asserted error. See Eberhardt, 163 Ga. at 803. In the great majority of cases, this requires a showing of actual harm, and again we have been offered no evidence suggesting that the results of trials are regularly affected even where some discovery violation occurred. Even in the

rare situations where harm must be presumed, as with the failure to properly qualify the jury in a civil case, many claims will have foundered under the due diligence requirement. For example, as mentioned previously, many potential jury qualification issues — like relationships with the parties or their counsel — would normally be apparent from the record to any diligent party and thus must be raised before the jury is seated or deemed waived for later review.

Accordingly, our decision today should be not be read as breaking any new ground, but rather as simply affirming the grant of an extraordinary motion for new trial based on the application of settled rules of law to a set of facts that may well be peculiar to Ford's ill-considered discovery practice. If this case is to teach any lesson, it is that the civil discovery process is supposed to work to allow the parties to obtain the information they need to prove and defend their cases at trial before impartial juries. Discovery is not supposed to be a game in which the parties maneuver to hide the truth about relevant facts, and when a party does intentionally mislead its adversary, it bears the risk that the truth will later be revealed and that the judgment it obtained will be re-opened to allow a new trial based on the truth.

Judgment affirmed. All the Justices concur.

58

MELTON, Justice, concurring.

Although I agree with the outcome of the majority opinion, I write separately to emphasize that the presumption of harm raised by the failure to qualify a jury with regard to insurance coverage is a *rebuttable* one. Atlanta Coach Co. v. Cobb, 178 Ga. 544 (174 SE 131) (1934). For example, under circumstances in which a trial is conducted from start to finish with no mention of any insurance carrier, harm would appear to be highly unlikely, given the fact that the jurors could not be adversely affected by information never disclosed to them. Under such circumstances, the presumptive harm associated with the lack of qualification might properly be rebutted. To accomplish this rebuttal, however, a party must raise a timely and proper argument. Because the evidence is not dispositive that any such rebuttal was both timely and properly made, I agree with the majority's conclusion that the trial court did not abuse its discretion by granting an extraordinary new trial in this case.

Decided February 24, 2014.

Product liability. Cobb State Court. Before Judge Tanksley.

Balch & Bingham, Michael J. Bowers, Christopher S. Anulewicz, Huff, Powell & Bailey, Audrey K. Berland, Michael R. Boorman, Kilpatrick, Townsend & Stockman, Curtis A. Garrett, Jr., Adam H. Charnes, for appellant.

Andrew W. Jones, Robin F. Clark, Beasley, Allen, Crow, Methvin, Portis & Miles, Benjamin E. Baker, Jr., Dana Taunton, for appellees.

King & Spalding, Chilton D. Varner, Stephen B. Devereaux, Susan M. Clare, Moore, Ingram, Johnson & Steele, Robert D. Ingram, Angela H. Smith, Harris, Penn & Lowry, Darren W. Penn, Madeline E. McNeeley, amici curiae.