[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14268

_____

D.C. Docket No. 7:19-cv-00181-MTT

RAY JEFFERSON CROMARTIE,

Plaintiff-Appellant,

versus

BRADFIELD SHEALY, RANDA WHARTON, GEORGIA DEPARTMENT OF
CORRECTIONS, and GDCP WARDEN,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(October 30, 2019)

Before ED CARNES, Chief Judge, MARTIN, and ROSENBAUM, Circuit Judges.

ED CARNES, Chief Judge:

Ray Jefferson Cromartie was convicted of murdering Richard Slysz during

an armed robbery committed more than twenty-five years ago. As punishment for

that crime, he is scheduled to be executed on October 30, 2019, at 7:00 p.m.  On

October 22, 2019, he filed a 42 U.S.C. § 1983 complaint in federal district court

claiming that Georgia's postconviction DNA statute, Ga. Code Ann. § 5-5-41(c), is

unconstitutional.  Two days later, he filed a motion to stay his execution so that the

district court could consider his § 1983 complaint.

On October 29, the district court issued a cogent opinion dismissing

Cromartie's complaint and denying his motion for a stay of execution.  Cromartie

appeals those rulings and asks this Court to issue an emergency stay of execution

pending the resolution of his appeal.  We affirm the district court and deny his

emergency motion for a stay of execution as moot.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  Cromartie's Crimes

On April 7, 1994, Cromartie went to the Madison Street Deli in

Thomasville, Georgia.  Cromartie v. State, 514 S.E.2d 205, 209 (Ga. 1999).  He

was carrying a .25 caliber pistol that he had borrowed earlier that day from his

cousin, Gary Young.  Id.  He walked behind the counter to where the store clerk,

Dan Wilson, was washing dishes, and shot him in the face.  Id.  After trying and

failing to open the cash register, he left empty-handed.  Id.  Wilson suffered a

severed carotid artery but fortunately he survived.  Id.  The next store clerk

Cromartie shot would not be so fortunate.

2

The following day Cromartie asked Young and Carnell Cooksey if they saw the news.  Id.  He told Young that he had shot Wilson.  Id.  He also asked Cooksey if he was "down with the 187," which meant robbery, and he talked about a Junior Food Store with "one clerk in the store and they didn't have no camera."  Id.  Cooksey said he was not interested.  Doc. 1-2 at 13.[1]

Cromartie found some people who were.  On April 10, Thaddeus Lucas agreed to drive Cromartie and Corey Clark to a store so they could steal beer.  Cromartie, 514 S.E.2d at 209.  While in the car, Cromartie had Lucas drive past the closest open store and go instead to the Junior Food Store.  Id.  Once they were there, Cromartie instructed Lucas to park at a nearby apartment complex and wait while he and Clark went into the store.  Doc. 1-2 at 15.

Richard Slysz was the clerk on duty and when the two entered the store he was sitting on a stool behind the register.  Id.  Cromartie shot him twice.  Id.  The first shot entered below his right eye, but left him alive and conscious.  Cromartie, 514 S.E.2d at 209.  Cromartie's second shot hit Slysz in his left temple.  Id.  The two shots to his head sealed Slysz's fate.  He lingered for a short while but died.  Id.

---

[1] We take "judicial notice of the state and federal court proceedings in which [Cromartie] was convicted or attacked his conviction."  Cunningham v. Dist. Attorney's Office, 592 F.3d 1237, 1255 (11th Cir. 2010).

As Slysz lay dying or dead, Cromartie and Clark tried and failed to open the cash register. Id. They fled, but not before Cromartie grabbed two 12-packs of Budweiser beer. Id. A clerk in a convenience store across the street heard the shots and saw two men fitting the general descriptions of Cromartie and Clark run from the store. Id. at 209–10. Cromartie was carrying the beer. Id. at 210. While they fled, one of the packs of beer tore open outside the store and some of the cans fell to the ground. Id. A passing motorist saw the two men run from the store and appear to drop something. Id. Clark would later testify that he gathered all but two of the cans before he and Cromartie got into Lucas' car. Doc. 1-2 at 16.

Cooksey testified that when Cromartie and the other two men met up with him after the shooting, they had a muddy pack of beer. Cromartie, 514 S.E.2d at 210. He recounted how Cromartie boasted about shooting the clerk twice. Id. In a muddy field next to the store the police found a portion of a Budweiser beer carton, two cans of beer, and a shoeprint. Doc. 1-2 at 17. It was identified as a possible match for Cromartie's shoes, but not for Young's, Clark's, or Lucas'. Id. The beer carton had Cromartie's thumb print on it. Id. A police canine unit tracked Cromartie's and Clark's scents to the nearby apartment complex where Cromartie had told Lucas to wait. Id. And a firearms expert determined that the .25 caliber pistol that Cromartie had borrowed from Young fired the bullets that had seriously wounded Wilson and killed Slysz. Cromartie, 514 S.E.2d at 210.

4

B.  Criminal Trial and Direct Appeal

Cromartie was indicted in Thomas County, Georgia on one count of malice murder, one count of armed robbery, one count of aggravated battery, one count of aggravated assault, and four counts of possessing a firearm during the commission of a crime.  Id. at 209 n.1.  Young, Cooksey, Lucas, and Clark testified as prosecution witnesses at Cromartie's trial.[2]  Id. at 210, 213; Cromartie v. Georgia, No. 2000-v-295, slip op. at 53–77 (Butts Cty. Sup. Ct. Oct. 9, 2012).  On September 26, 1997, the jury found him guilty of all counts, and five days later it recommended a sentence of death.  Cromartie, 514 S.E.2d at 209 n.1.  The trial court sentenced Cromartie to death for the malice murder, to life imprisonment for the armed robbery, and for his other crimes to lesser terms of imprisonment, all of which were to be served consecutively.  Id.  The court denied Cromartie's motion for a new trial.  Id.

--------

[2] Several individuals who testified against Cromartie at trial changed or recanted their testimony during his first state habeas proceeding.  See Notice of Filing, Cromartie v. Warden, GDCP, No. 7:14-cv-00039 (M.D. Ga. July 15, 2014), ECF 23-37 at 54–77 (state habeas court describing testimony and new evidence in order denying state habeas petition); id. ECF 24-9 (state habeas court denying motion to reconsider after reviewing the changed testimony of Gary Young).  But the state habeas court concluded that the recantations and other changes in testimony were not reliable.  Id. ECF 24-9; see also In re Davis, 565 F.3d 810, 825 (11th Cir. 2009) ("[R]ecantation testimony 'upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction.'") (quoting Dobbert v. Wainwright, 468 U.S. 1231, 1233–34 (1984) (Brennan, J., dissenting)); United States v. Santiago, 837 F.2d 1545, 1550 (11th Cir. 1988) ("[R]ecantations are viewed with extreme suspicion by the courts.").

The Georgia Supreme Court affirmed Cromartie's convictions and sentences on March 8, 1999.  Id. at 215.  He filed a motion for reconsideration, which the court denied.  Notice of Filing, Cromartie v. Warden, GDCP, No. 7:14-cv-00039 (M.D. Ga. July 7, 2014), ECF 18-31.  The United States Supreme Court denied his petition for certiorari, Cromartie v. Georgia, 528 U.S. 974 (1999), and his petition for rehearing, Cromartie v. Georgia, 528 U.S. 1108 (2000).

## C.  First Order Setting Execution

On April 19, 2000, the Thomas County Superior Court issued an order setting Cromartie's execution for the week of May 9 through May 16, 2000.  Notice of Filing, Cromartie, No. 7:14-cv-00039, ECF 19-3.  Cromartie filed a motion for a stay of execution in both the superior court and the Georgia Supreme Court.  Id. ECF 19-4, 19-9.  Both of those motions were denied.  Id. ECF 19-6, 19-12.  Cromartie's execution was, however, automatically stayed when he filed a state habeas petition four days before the week of his scheduled execution.  See id. ECF 19-13.

## D.  State Habeas Petition

Cromartie filed a habeas petition in the Butts County Superior Court on May 5, 2000, id. ECF 19-14, and amended it on December 9, 2005, id. ECF 20-22.  The court held an evidentiary hearing on August 12 through 14, 2008.  Id. ECF 21-24.

It denied his petition in an eighty-six page order on February 9, 2012. Id. ECF 23-37.

After Gary Young, a trial witness, recanted some of his testimony Cromartie filed a motion to reconsider the denial of his state habeas petition. Id. ECF 23-42. The court reopened discovery so that Young could be deposed. Id. ECF 23-44, 23-45, 23-47. On October 9, 2012, the court found that Young's recantation was unreliable and denied Cromartie's motion to reconsider. Id. ECF 24-9; see supra note 2. He filed in the Georgia Supreme Court an application for a certificate of probable cause to appeal the February 9 order that denied his habeas petition and the October 9 order that denied his motion for reconsideration. Id. ECF 24-10. The Georgia Supreme Court denied his application, id. ECF 24-14, and the United States Supreme Court denied his petition for a writ of certiorari, Cromartie v. Chatman, 572 U.S. 1064 (2014).

### E. Federal Habeas Petition

Cromartie filed a habeas petition in the Middle District of Georgia on March 20, 2014, and amended it on June 22, 2015. Petition for Writ of Habeas Corpus, Cromartie, No. 7:14-cv-00039, ECF 1, 62. The district court denied the habeas petition and declined to issue a certificate of appealability on any of his claims. Cromartie v. Warden, No. 7:14-cv-00039, 2017 WL 1234139, at *43–44 (M.D. Ga. Mar. 31, 2017). The district court thereafter denied Cromartie's Rule 59

motion to alter or amend the judgment.  Order, Cromartie, No. 7:14-cv-00039, ECF 84.

Cromartie then filed in this Court an application for a certificate of appealability, which we denied.  Cromartie v. GDCP Warden, No. 17-12627, 2018 WL 3000483, at *1 (11th Cir. Jan. 3, 2018); see also Order, Cromartie, No. 17-12627, ECF 26 (denying motion for reconsideration).  The United States Supreme Court denied certiorari on December 3, 2018.  Cromartie v. Sellers, 139 S. Ct. 594 (2018).

F.  Extraordinary Motion for a New Trial & Postconviction DNA Testing

On December 28, 2018, Cromartie filed a motion in the Thomas County Superior Court asking for a new trial and DNA testing on various items that had been introduced as evidence during his trial.  Doc. 11 ¶ 27.  He contended that two advancements in DNA technology — the ability to test "touch DNA" and probabilistic genotyping — could reveal that one of his accomplices was the actual triggerman.  Doc. 1-2 at 31–32.  Cromartie does not deny being involved in the robbery in which Slysz was murdered but contends that he did not fire the shots.[3] Doc 11 ¶ 23 n.5.

---

[3] Cromartie conceded in the district court that the ability to test touch DNA "first became an accepted procedure in 2006 or 2007," but argued that it was "not refined, and did not become more developed until 2010 or 2011."  He also stated that probabilistic genotyping, the other type of DNA testing he sought to conduct, became available "within the last two years."  He makes the same statements on appeal.

8

After the court held an evidentiary hearing, it issued an order denying Cromartie's motion on September 16, 2019.  Doc. 1-2 at 3–36.  The court concluded that (1) even if the DNA testing showed what Cromartie alleged it would, the results would not establish a reasonable probability that the verdict would have been different, and (2) he could not show that his motion was not filed for the purpose of delaying his execution.  Id.  On October 25, 2019, the Georgia Supreme Court denied Cromartie's application for a discretionary appeal.  Cromartie v. State, Case No. S20D0330 (Ga. Oct. 25, 2019).

## G.  Second Order Setting Execution

On October 16, 2019, the Thomas County Superior Court issued an order setting Cromartie's execution for the week of October 30 through November 6, 2019.  Doc. 7 at 5 n.1.  The Georgia Department of Corrections scheduled it for October 30 at 7:00 p.m.  Id. at 1.  Cromartie moved in the Georgia Supreme Court for a stay of the execution pending his appeal of the trial court's order denying his request for DNA testing.  Cromartie, Case No. S20D0330.  That court dismissed his motion for a stay as moot because it denied his application for a discretionary appeal.  Id.

On October 24, 2019, Cromartie filed in the Thomas County Superior Court an emergency motion to recall the order setting the execution period, a motion that has been denied.  He also filed in the Butts County Superior Court a second state

9

habeas petition, which has also been denied.  And he filed with the Georgia State Board of Pardons and Paroles a request for a 90-day stay of his execution, which the Board denied.  The Board also sua sponte considered commuting his sentence but declined to do so upon a review of all the facts and circumstances of his case.

### H.  Cromartie's 42 U.S.C. § 1983 Complaint

On October 22, 2019, Cromartie filed in the United States District Court for the Middle District of Georgia a 42 U.S.C. § 1983 complaint, which is the subject of this appeal.  In that complaint, he alleged that Georgia's procedure for determining whether a prisoner is entitled to postconviction DNA testing violates his Fourteenth Amendment right to due process and his First and Fourteenth Amendment right to access the courts.[4]  Two days after filing his complaint, Cromartie filed a motion for a stay of his execution so that the district court could consider his claims.

The defendants filed a motion to dismiss on October 25, contending both that the district court lacked subject matter jurisdiction and that Cromartie had failed to state any claims upon which relief could be granted.  Cromartie filed a response and an amended complaint on October 28.  On October 29, the district

---

[4] Cromartie's complaint also stated in passing that the State's refusal to allow the DNA testing he wants violates his Eighth Amendment rights.  The district court correctly dismissed this claim because it amounted to nothing more than a conclusory allegation.  See Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).

court dismissed Cromartie's complaint and denied his motion for a stay, finding that he failed to state a claim upon which relief could be granted and that he acted with "unjustified delay in filing [his] action." This is Cromartie's appeal.

## II. STANDARD OF REVIEW

We review de novo the grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Alvarez v. Att'y Gen., 679 F.3d 1257, 1260–61 (11th Cir. 2012). "Like the district court, we are required to accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." Id. at 1261.

We review the denial of a motion for a stay of execution for abuse of discretion. Muhammad v. Sec'y, Fla. Dep't of Corr., 739 F.3d 683, 688 (11th Cir. 2014). "A district court abuses its discretion if, among other things, it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." Long v. Sec'y, Dep't of Corr., 924 F.3d 1171, 1176 (11th Cir. 2019) (quotation marks omitted).

A court may grant a stay of execution only if the moving party shows that "(1) he has a substantial likelihood of success on the merits, (2) he will suffer irreparable injury unless the injunction issues, (3) the injunction would not substantially harm the other litigant, and (4) if issued, the injunction would not be adverse to the public interest." Id. at 1175.

11

## III.  DISCUSSION

### A.  Cromartie's Facial Procedural Due Process Claim

Cromartie claims that Georgia's procedure for determining whether a prisoner is entitled to postconviction DNA testing is facially unconstitutional under the Fourteenth Amendment's Due Process Clause.

### 1.  The Framework for Evaluating Cromartie's Claim

The Supreme Court established a framework for evaluating claims like Cromartie's in District Attorney's Office for the Third Judicial District v. Osborne, 557 U.S. 52 (2009).  Osborne, an Alaska prisoner, filed a § 1983 suit claiming that the Due Process Clause gave him a right to access crime scene evidence for DNA testing, and the district court granted summary judgment in his favor.  Id. at 60–61. The Ninth Circuit affirmed after concluding that prisoners have a right to access DNA evidence in postconviction proceedings that is analogous to a criminal defendant's right to material exculpatory evidence before trial under Brady v. Maryland, 373 U.S. 83 (1963).  Osborne, 557 U.S. at 61.

The Supreme Court reversed.  Id. at 61–62.  It acknowledged that if state law entitles prisoners to challenge their convictions on the ground of actual innocence, they have a "liberty interest" in doing so that is protected by the Due Process Clause.  Id. at 68.  The Court cautioned, however, that a prisoner's liberty interest is "limited" compared to a criminal defendant's because the prisoner "has already

12

been found guilty at a fair trial." Id. at 68–69. As a result, the state has "more flexibility in deciding what procedures are needed in the context of postconviction relief" than it does in deciding what procedures are needed in a criminal trial. Id. at 69.

With that distinction in mind, the Supreme Court set out this test: A state's procedure for accessing postconviction DNA testing violates due process if it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." Id. (quotation marks omitted). Put another way, "[f]ederal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." Id. The Court has since made clear that this is a difficult standard to meet, stressing that "Osborne severely limits the federal action a state prisoner may bring for DNA testing" and "left slim room for the prisoner to show that the governing state law denies him procedural due process." Skinner v. Switzer, 562 U.S. 521, 525 (2011). Those of us on the lower courts have paid attention. Every court of appeals to have applied the Osborne test to a state's procedure for postconviction DNA testing has upheld the constitutionality of it. See, e.g., Morrison v. Peterson, 809 F.3d 1059, 1067–69 (9th Cir. 2015) (holding California's procedure constitutional); Alvarez, 679 F.3d at 1266 n.2 (holding Florida's constitutional);

13

McKithen v. Brown, 626 F.3d 143, 152 (2d Cir. 2010) (holding New York's constitutional); Tevlin v. Spencer, 621 F.3d 59, 71 (1st Cir. 2010) (holding Massachusetts' constitutional); Cunningham v. Dist. Attorney's Office, 592 F.3d 1237, 1261 (11th Cir. 2010) (holding Alabama's constitutional).

Though it has made clear that a prisoner will seldom be able to meet the Osborne test, the Supreme Court has "attempted neither to define exactly the level of process required to satisfy the fundamental fairness standard nor to specify the process due." Cunningham, 592 F.3d at 1261. But Osborne gives guidance. The Court held in that case there was "nothing inadequate" about Alaska's procedure for several reasons. Osborne, 557 U.S. at 69–70. The Alaska procedure "provide[d] a substantive right to be released on a sufficiently compelling showing of new evidence that establishe[d] innocence." Id. at 70. It "exempt[ed] such claims from otherwise applicable time limits." Id. It "provide[d] for discovery in postconviction proceedings," and "that . . . discovery procedure [was] available to those seeking access to DNA evidence." Id. The Supreme Court discussed limits that Alaska imposed on postconviction relief claim evidence, such as requiring that it be "newly available," "sufficiently material," and "diligently pursued." Id. Those limits were constitutional, the Court reasoned, because they were "similar to those provided for . . . by federal law and the law of other States" and were "not

14

inconsistent with the traditions and conscience of our people or with any recognized principle of fundamental fairness." Id. (quotation marks omitted).[5]

Those new availability, materiality, and diligence requirements are not the only ones that the Supreme Court approved in Osborne. It also noted approvingly that the federal statute governing postconviction DNA testing — which it referred to as a "model for how States ought to handle the issue" — as well as several state statutes, required "a sworn statement that the applicant is innocent." Osborne, 557 U.S. at 63. Other state statutes "require[d] the requested testing to have been technologically impossible at trial" or "den[ied] testing to those who declined testing at trial for tactical reasons." Id. (citations and quotation marks omitted). The Court explained that those laws "recognize[d] the value of DNA evidence but also the need for certain conditions on access to the State's evidence." Id. The Court's discussion "clearly implie[d], if it [did] not actually hold, that such limitations are permissible" under the Due Process Clause. Cunningham, 592 F.3d at 1261.

Using the framework that Osborne established, this Court has held that Alabama's and Florida's procedures for postconviction DNA testing are

---

[5] The Court also noted that in addition to Alaska's statutory procedure, the Alaska Court of Appeals had "suggested that the State Constitution provides an additional right of access to DNA," which in certain cases might act as a "failsafe" for those who could not satisfy the statutory requirements. Id. "The Court did not suggest, however, that [this alternative] was essential" when concluding that Alaska's procedure was constitutionally adequate. Cunningham, 592 F.3d at 1263.

constitutional.  See Alvarez, 679 F.3d at 1266 n.2 (Florida); Cunningham, 592 F.3d at 1269 (Alabama).[6]  In doing so, we explained that because the Supreme Court "did not define a level of process necessary to satisfy the fundamental fairness standard," we were left to compare Alabama's and Florida's procedures to those that the Court had already approved in Osborne.  Cunningham, 592 F.3d at 1262–63; see also Alvarez, 679 F.3d at 1266 n.2.  We explained that "Osborne itself invites such a comparative approach, describing key elements of Alaska's process as both 'similar' to other state and federal statutes and also 'not inconsistent' with fundamental fairness."  Id. at 1263.  We apply that comparative approach here.

## 2.  Analyzing Georgia's Procedure

Section 5-5-41 of the Georgia Code sets out the procedure that a prisoner may use to challenge his conviction based on postconviction DNA testing.  It allows the prisoner to file two motions: an extraordinary motion for a new trial and a motion for postconviction DNA testing.  Ga. Code Ann. § 5-5-41(a)-(c).  The two motions are generally, but not always, filed together.  See Gary v. Warden, Ga. Diagnostic Prison, 686 F.3d 1261, 1276 (11th Cir. 2012) ("A motion for DNA

---

[6] Cunningham addressed whether Alabama's "general procedures for postconviction relief [were] constitutionally adequate to secure any limited liberty interest [the plaintiff] may have [had] in seeking DNA evidence that might prove his innocence."  592 F.3d at 1262.  Alabama now has a postconviction DNA testing statute.  Ala. Code § 15-18-200.  This Court has not yet addressed the constitutionality of that statute.

testing under O.C.G.A. § 5-5-41(c) is generally filed in conjunction with an extraordinary motion for a new trial pursuant to O.C.G.A. § 5-5-41(a).").

What makes an extraordinary motion for a new trial extraordinary is the time at which it is filed.  Normally, Georgia prisoners must file a motion for a new trial within 30 days of the entry of judgment.  Ga. Code Ann. § 5-5-40(a).  But in limited circumstances, a prisoner can file a motion after those 30 days have expired.  To do so, the prisoner must show that there is a "good reason" for the delay.  Id. § 5-5-41(a).  And the Georgia Supreme Court has held that "[g]ood reason exists only where the moving party exercised due diligence but, due to circumstances beyond [his] control, was unable previously to discover the basis for the claim [he] now asserts."  Bharadia v. State, 774 S.E.2d 90, 93 (Ga. 2015) (quotation marks omitted) (some alterations in original).[7]

A motion for postconviction DNA testing comes with its own set of requirements.  A prisoner must show, among other things, that: (1) the reason he did not have the DNA testing done for trial is that he either did not know about the evidence then, or the testing was not technologically available; (2) the "identity of the perpetrator was, or should have been, a significant issue in the case;" and (3)

_____

[7] When evaluating a facial challenge to the constitutionality of a state postconviction DNA testing statute, we analyze the statute as authoritatively construed by the state's courts.  See Skinner, 562 U.S. at 531–32; Kennedy v. Louisiana, 554 U.S. 407, 425 (2008) ("Definitive resolution of state-law issues is for the States' own courts . . . ."); Blue Cross & Blue Shield of Ala., Inc. v. Nielsen, 116 F.3d 1406, 1413 (11th Cir. 1997) (explaining that "[t]he final arbiter of state law is the state supreme court").

the "requested DNA testing would raise a reasonable probability that the petitioner would have been acquitted if the results of DNA testing had been available at the time of conviction, in light of all the evidence in the case." Ga. Code Ann. § 5-5-41(c)(3)(B)–(D). In addition, the prisoner must state that the motion was "not filed for the purpose of delay" and that the requested DNA testing had not already been ordered in an earlier proceeding. Id. § 5-5-41(c)(4).

If the prisoner meets those requirements, he is entitled to a hearing on the motion within 90 days. Id. § 5-5-41(c)(6)(A). At the hearing, both sides "may present evidence by sworn and notarized affidavits or testimony" and may submit additional legal memoranda or evidence for up to 30 days after the hearing concludes. Id. § 5-5-41(c)(6)(C), (D).

The court is required to grant the motion for DNA testing if it determines that the prisoner has met all of the requirements we have discussed, and that: (1) the evidence is available in a condition that would permit testing; (2) the evidence has been subject to a chain of custody; (3) the evidence "was not tested previously or, if tested previously, the requested DNA test would provide results that are reasonably more discriminating or probative of the identity of the perpetrator than prior test results;" (4) the motion was not filed "for the purpose of delay;" (5) the "identity of the perpetrator of the crime was a significant issue in the case;" (6) the requested testing "employs a scientific method that has reached a scientific state of

18

verifiable certainty;" and (7) the prisoner has "made a prima facie showing that the evidence sought to be tested is material to the issue of the [prisoner]'s identity as the perpetrator." Id. § 5-5-41(c)(7).  The prisoner may appeal a ruling denying his motion and the State may appeal a ruling granting it.  Id. § 5-5-41(c)(13).

Georgia's procedure is substantially similar to the one that the Supreme Court approved in Osborne.  Like Alaska's, it provides prisoners with an avenue to challenge their convictions based on DNA evidence showing that they are innocent.  Osborne, 557 U.S. at 64; Westmoreland v. Warden, 817 F.3d 751, 753–54 (11th Cir. 2016).  Like Alaska's, it allows prisoners to file the motion after the otherwise applicable time limit has expired.  Osborne, 557 U.S. at 64.  Like Alaska's, it requires that the prisoner show he acted with due diligence and without the purpose of delay.  Id.  Like Alaska's, it requires that the evidence or the requested testing be newly available.  Id.  And like Alaska's, it requires that the evidence be material enough to undermine the verdict.  Id.[8]

---

[8] In Georgia, the prisoner must show that the requested DNA testing "would raise a reasonable probability that [he] would have been acquitted if the results of the DNA testing had been available at the time of the conviction, in light of all the evidence in the case."  Ga. Code Ann. § 5-5-41(3)(D); see also id. § 5-5-41(c)(7)(G).  In Alaska, the prisoner must show that the evidence he seeks to have tested is "sufficiently material."  Osborne, 557 U.S. at 70.  Unlike Georgia, Alaska imposes a more demanding standard if the prisoner files more than a year after the conviction becomes final, requiring in that circumstance that the prisoner "set[] out facts supported by evidence that is admissible and . . . establishes by clear and convincing evidence that the applicant is innocent."  Id. at 64 (quoting Alaska Stat. § 12.72.020(b)(2)).

There are some differences.  The Georgia statute has one requirement that Alaska's does not: the prisoner must show that the identity of the perpetrator is a significant issue in the case.  Ga. Code Ann. § 5-5-41(c)(3)(C).  But the federal statute for postconviction DNA testing has a similar requirement, see 18 U.S.C. § 3600(a)(7), and the Osborne Court approved of that statute, calling it a "model for how States ought to handle the issue" of postconviction DNA testing.  Osborne, 557 U.S. at 63; see also Alvarez, 679 F.3d at 1266 n.2 (explaining that the Osborne Court "endorsed" the federal statute).  Which may be why Cromartie does not argue that the Georgia statute is fundamentally unfair because it requires that identity be an issue.

And Alaska's statute offers discovery whereas the Georgia statute, at least on its face, does not.  Osborne, 557 U.S. at 64.  But, once again, the federal statute for postconviction DNA testing, which the Supreme Court blessed in Osborne, also does not provide for discovery (it only requires the government to provide the prisoner with a limited inventory).  See 18 U.S.C. § 3600(b)(1)(C).  And that may, once again, be why Cromartie doesn't argue that the failure to explicitly provide for discovery renders the Georgia statutory procedure fundamentally unfair.

There are ways the Georgia procedure is more favorable to prisoners than the Alaska or federal procedures.  For example, in Georgia a prisoner is entitled to a hearing on his motion if he meets the requirements for filing, and he is also

20

expressly entitled to an appeal.  Ga. Code. Ann. § 5-5-41(c)(6)(A), (c)(13).  Under the Alaska and federal procedures the prisoner is not.  See Alvarez, 679 F.3d at 1266 n.2 (making the same points about Florida's procedure compared to the Alaska and federal procedures).  And in Georgia, the government must respond within 60 days to the prisoner's motion seeking postconviction DNA testing, while the federal statute merely says it should respond within "a reasonable time period." Compare Ga. Code Ann. § 5-5-41(c)(5), with 18 U.S.C. § 3600(b)(1)(B); see also Alvarez, 679 F.3d at 1266 n.2 (making the same point about Florida's procedure).

### 3.  Cromartie's Arguments

Despite the similarity between Georgia's procedures and the ones endorsed in Osborne, Cromartie argues that Georgia's are fundamentally unfair for two reasons.  First, he takes issue with Georgia's requirement that a prisoner show he acted with due diligence in filing his motion.  According to him, that requirement means a prisoner must seek DNA testing on the physical evidence in his case "as soon as possible," even if the DNA testing that exists at that time is not technologically advanced enough to provide meaningful results.  We don't see it that way.

In discussing the due diligence requirement, the Georgia Supreme Court has stated that a prisoner must show that he "exercised due diligence but, due to circumstances beyond [his] control, was unable previously to discover the basis for

21

the claim [he] now asserts." Ford Motor Co. v. Conley, 757 S.E.2d 20, 30 (Ga. 2014). The fact that DNA testing was not advanced enough to render a meaningful result in a prisoner's case would satisfy that standard.

If there were any doubt about how Georgia's due diligence standard operates when it comes to DNA testing, we need only look at the plain text of the statute to rule out Cromartie's interpretation. Section 5-5-41(c)(3)(B) requires a prisoner to show that the evidence he wants tested "was not subjected to the requested DNA testing because the existence of the evidence was unknown to the petitioner . . . prior to trial or because the technology for the testing was not available at the time of trial." (Emphasis added.) And § 5-5-41(c)(7)(C) provides that if the evidence was already tested, the prisoner must show that "the requested DNA test would provide results that are reasonably more discriminating or probative of the identity of the perpetrator than prior test results." Reading those provisions together, a prisoner need not pursue DNA testing until the technology has advanced enough to do some good. Or he could seek DNA testing at the time of trial and then again if the technology improved enough to offer a more promising result, which is to say, would be "reasonably more discriminating or probative." Ga. Code Ann. § 5-5-41(c)(7)(C). All that the due diligence standard requires is, as it says, that the prisoner act with the diligence that is due under the circumstances. Which is an

22

established principle of law.  See Cromartie v. Shealy, No. 7:19-cv-00181-MTT, slip op. at 14 n.8 (M.D. Ga. Oct. 28, 2019).[9]

Second, Cromartie takes issue with Georgia's requirement that the favorable DNA testing results create a reasonable probability that he would have been acquitted had those results been available at trial.  See Ga. Code Ann. § 5-5-41(c)(3)(D); see also Crawford v. State, 597 S.E.2d 403, 404 (Ga. 2004).  He argues that because the Georgia Supreme Court has held that a prisoner cannot make that showing if the evidence presented at trial was overwhelming, the requirement "has resulted in a totally subjective review of the trial evidence, with no meaningful assessment of the weaknesses in that evidence or the manner in which DNA test results could offset the trial evidence and change the entire evidentiary picture."  We disagree.

---

[9] Cromartie argues that the diligence requirement is especially problematic because Georgia allows a prisoner to file only one extraordinary motion for a new trial.  Ga. Code Ann. § 5-5-41(b) (emphasis added).  But because Cromartie has filed only one extraordinary motion for a new trial, that limitation does not affect him; it has no relevance to his case.

This argument of his does risk confusing motions for new trial with motions for postconviction DNA testing.  The two are distinct.  See White v. State, 814 S.E.2d 447, 451 (Ga. Ct. App. 2018) (noting a motion for postconviction DNA testing may be filed before any extraordinary motion for a new trial); see also State v. Clark, 615 S.E.2d 143, 145–46 (Ga. Ct. App. 2005) (reviewing a motion for postconviction DNA testing that was filed without an accompanying extraordinary motion for a new trial).  Cromartie has not pointed to any Georgia decision holding that a prisoner cannot file multiple motions for postconviction DNA testing.  Nor has he pointed to any decision holding that if a prisoner obtains favorable DNA results after he has already filed his one extraordinary motion for a new trial, he cannot file a state habeas petition seeking relief based on those results.

The first problem with Cromartie's argument is that the Supreme Court has already approved of this type of materiality standard in Osborne. 557 U.S. at 64. We will follow what the Supreme Court said.

The second problem with Cromartie's argument is that it is at odds with stacks of precedent accepting and applying "reasonable probability" standards like this one in a number of other contexts. See, e.g., Kyles v. Whitley, 514 U.S. 419, 433 (1995) ("[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.") (quotation marks omitted); United States v. Olano, 507 U.S. 725, 734 (1993) (stating that for a court to correct unpreserved error, the "the error must have been prejudicial:  It must have affected the outcome of the district court proceedings"); Strickland v. Washington, 466 U.S. 668, 695 (1984) ("When a defendant challenges a conviction [based on ineffective assistance of counsel], the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.").  To hold, as Cromartie insists, that the reasonable probability of a different result standard is "totally subjective" and allows "no meaningful assessment of the weaknesses in [the] evidence," would upend decades of precedent related to Brady and Strickland issues.

24

B. Cromartie's As-Applied Due Process Claim

In his complaint, Cromartie states in passing that he also "challenges the constitutionality of § 5-5-41(c) . . . as applied by the Georgia courts." There are three problems with that.

First, to the extent Cromartie made an as-applied challenge in his complaint, he expressly disavowed it in his reply to the State's motion to dismiss. There, he stated: "Plaintiff brings a facial challenge, not an as-applied challenge." Doc. 10 at 6. Given that disavowal, any as-applied argument that Cromartie might have is waived. See United States v. Phillips, 834 F.3d 1176, 1183 (11th Cir. 2016) (explaining that "when a defendant waives an argument in the district court, we cannot review it") (emphasis omitted).

Second, even if the argument were not waived, it is foreclosed by this Court's precedent. See Alvarez, 679 F.3d at 1262–64 (holding that a prisoner's as-applied procedural due process claim attacking the state court's application of that state's DNA access procedure to the facts of his case is barred in these circumstances by the Rooker-Feldman doctrine).

Third, the claim as Cromartie presented it amounts to an assertion that the state court misapplied state law. See Doc. 10 at 14–18 (arguing that the Georgia court arbitrarily applied § 5-5-41(c)(3)(D)'s reasonable probability requirement in his case). But a state court's misapplication of state law, without more, does not

violate the federal Constitution.  See, e.g., Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); Snowden v. Hughes, 321 U.S. 1, 11 (1944) ("Mere violation of a state statute does not infringe the federal Constitution."); Gissendaner v. Comm'r, Ga. Dep't of Corr., 794 F.3d 1327, 1333 (11th Cir. 2015) (noting that there is "a long line of Supreme Court decisions holding that a violation of state procedural law does not itself give rise to a due process claim"); cf. Estelle v. McGuire, 502 U.S. 62, 67–68 (1990) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

For each of those reasons, the district court properly dismissed Cromartie's as-applied claim.

## C.   Cromartie's Right to Access the Courts Claim

Cromartie also contended in his complaint that postconviction access to evidence for DNA testing is necessary to vindicate his First and Fourteenth Amendment right to access the courts.  But he "neglected to make these arguments in [his] initial brief on appeal, and our precedent unambiguously provides that issues that are not clearly outlined in an appellant's initial brief are deemed abandoned." Al-Amin v. Smith, 511 F.3d 1317, 1336 (11th Cir. 2008) (quotation

marks and brackets omitted); see also Tanner Advert. Grp., L.L.C. v. Fayette Cty., 451 F.3d 777, 785 (11th Cir. 2006) (en banc).

Even if he had not abandoned his claim, it fails on the merits. This Court has held that to violate a person's right to access the courts, there must be "actual injury." Cunningham, 592 F.3d at 1271. That actual injury requirement "derives from the constitutional doctrine of standing" and "reflects the fact that the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." Id. (quotation marks omitted).

To show actual injury, the plaintiff must "have an underlying cause of action the vindication of which is prevented by the denial of access to the courts." Id. Cromartie has suggested two. He says that the potentially exculpatory DNA evidence could be used to challenge his conviction and death sentence in a motion for a new trial or to obtain executive clemency. Neither proffered cause of action will support an access to the courts claim.

To begin with, Cromartie's argument that the alleged inadequacy of Georgia's procedure for postconviction DNA testing has prevented him from being able to challenge his conviction or sentence "essentially mirrors" his procedural due process claim. Cunningham, 592 F.3d at 1272. Because we have concluded that Georgia's postconviction DNA procedure complies with due process

27

requirements, "it follows that it does not improperly interfere with [Cromartie's] right of access to the courts." Id.  That Cromartie has not succeeded in obtaining potentially exculpatory evidence under the state's constitutionally adequate procedures is not a denial of his right to access the courts.  Id.

Cromartie's argument about executive clemency fares no better.  The Supreme Court has held that there is no federal constitutional right to executive clemency.  See Connecticut Bd. of Pardons v. Dumschat, 452 U.S. 458, 464 (1981).  As a result, executive clemency "cannot be a basis for an access to courts claim." Cunningham, 592 F.3d at 1272.

Because Cromartie has failed to identify a cause of action that meets the actual injury requirement for a claimed denial of access to the courts, the district court was right to dismiss his access to the courts claims for lack of subject matter jurisdiction.

## IV.  CONCLUSION

We **AFFIRM** the district court's decision dismissing Cromartie's § 1983 complaint and denying his motion for a stay of execution, and we **DENY** as moot the emergency motion for a stay of execution he filed in this Court.[10]

---

[10] In stating its reasons for denying Cromartie's "requests for declaratory and injunctive relief, including a stay," the district court relied in part on its conclusion that Cromartie "unjustifi[ably] delay[ed] in filing this action."  In light of our determination that Cromartie failed to state a claim upon which relief could be granted, there is no need for us to reach that issue.

MARTIN, Circuit Judge, concurring in the judgment:

The Majority opinion correctly sets out the precedent that binds our decision here.  I therefore concur in its judgment.